In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-08-00134-CR


______________________________




JAMES FELTON WILLIAMS, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 291st Judicial District Court


Dallas County, Texas


Trial Court No. F-06-67747-U




 




Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Justice Moseley



MEMORANDUM OPINION



 James Felton Williams appeals his conviction of infliction of serious bodily injury to a
twenty-three-month-old girl, S.H. Williams was sentenced to forty years' imprisonment in the Texas
Department of Criminal Justice-Correctional Institutions Division and was ordered to pay a
$10,000.00 fine. (1) Williams raises three points on appeal wherein he alleges that: (1) the evidence
was legally and factually insufficient to support the conviction; (2) the jury charge was defective;
and (3) he was deprived of the effective assistance of counsel because his trial counsel's failure to
object to the jury charge constituted ineffective assistance of counsel. We affirm. 

I. Factual Background 

 Jacquelyn McMaryion dated Williams for four months before he moved into her Dallas
apartment with her children, S.H. and a younger male child, R.H. (2) Because Williams was not
employed, he stayed in the apartment he shared with McMaryion to tend the children during
McMaryion's evening shift at Walgreens drug store. On June 27, 2006, McMaryion woke up, fed
the children, watched cartoons with them, and took them to an outdoor jungle gym to play. 
Afterward, she walked the children home, bathed them, fed them lunch, and prepared herself for
work as the children watched television. Williams was awake by the time she left for work at 3:00
p.m. 

 McMaryion returned to the apartment for a 7:00 p.m. dinner break. Although the children
did not normally go to bed that early, they both appeared to be asleep in bed when she checked on
them. The infant boy, R.H., heard his mother's voice and started making noises. Although S.H.
"opened her eye a little, . . . she didn't really say anything." McMaryion sat on the bed, talked to
R.H., and put him back to sleep. Unaware at that time that anything was amiss, McMaryion then
returned to work, leaving the children to be babysat by Williams. 

 Williams's friend, Rodney Horton, arrived at the apartment after McMaryion left. Horton and
Williams were playing video games in Williams's bedroom when one of the children began to cry. 
Williams went into R.H.'s bedroom alone and when Horton followed, he saw that Williams was
changing R.H.'s diaper. Horton noticed that it appeared that the child bore bruises and came closer
to get a better look. Horton picked up R.H., who "acted like he was in pain . . . you could hear . . .
his bones or something moving." Horton immediately called McMaryion because he thought R.H.
had been punched. 

 McMaryion testified that she received Horton's call (during which he advised her to hurry
home) only ten minutes after she had arrived back at her workplace. She was running back to her
apartment when Horton and his girlfriend, who were carrying R.H. with them, met McMaryion on
the street. R.H. looked hurt and was whining and crying. Horton, believing S.H. to be sleeping
peacefully, did not bring her. McMaryion did not feel comfortable leaving S.H. alone and asked
Horton to return to the apartment to get S.H. Upon arriving at the apartment, Horton and
McMaryion asked Williams what had happened. Williams claimed he did not know, but suggested
that the children's grandmother may have harmed them when they had visited her a few days earlier. 

 Horton argued with Williams while McMaryion fetched S.H., who appeared to be asleep. 
A neighbor, Curtis Vaughn, was walking when he saw Horton holding R.H. and his girlfriend
holding S.H. Horton announced they were going to the hospital. Vaughn said S.H. "looked like
somebody that was like on her last leg . . . having a hard time breathing. Just like suffering, that type
of look." 

 Horton drove the children and McMaryion to the hospital emergency room, leaving Williams
at the apartment. During the ride to the hospital, Horton noticed that S.H. could not sit up, was
incoherent, and was not responding to stimuli. Upon arrival at the hospital emergency room,
McMaryion asked hospital personnel to help R.H., at which point she noticed that something was
also wrong with S.H.; the child had awoken and "her eyes got to rolling to the back of her head." 
Pediatrician Matthew Cox testified that S.H. was admitted to the intensive care unit (ICU) because
she had a brain injury, "essentially had the equivalent of having a stroke" while in the hospital, and
was not moving the left side of her body. In addition to the immediate situation, there were bruises
across S.H.'s front chest wall, a healing two-and-a-half-inch long abrasion on her neck, a broken left
humerus bone, lacerations to her liver, hemorrhaged retinas, and skull fractures which resulted in the
swelling on the right side of her brain. Because the X-rays revealed no signs of healing, Dr. Cox
concluded that most of S.H.'s injuries were fresh, having probably occurred between 3:00 and 6:00
p.m. of that same day. S.H. suffered permanent brain damage as a result of her trauma and doctors
determined she would thereafter be required to take medication to control her seizures. Dr. Cox
concluded that S.H. suffered a violent impact injury, possibly caused by being thrown against a wall,
kicked, and/or punched with a fist. 

 R.H.'s injuries were likewise grave upon his admittance to the hospital, having six broken
ribs on each side of his chest wall, a broken humerus, ulna, and radius in his right forearm, a
damaged liver, and round bruises (that appeared to be adult bite marks) on his chest wall and cheek. 
Dr. Cox determined that all the broken bones and the liver laceration were new injuries. He said that
R.H. experienced a great deal of pain; he cried and screamed when touched. Over the course of
treatment, R.H. began to develop a fever, cold-like symptoms, distension of the stomach, and
respiratory problems. Tests in the ICU revealed that R.H. had parainfluenza 3, a common virus that
causes croup and streptococcus pneumonia. 

 Meanwhile, Dr. Cox called Dallas Detective Abel Lopez to report the condition of the
children. Lopez traveled to McMaryion's apartment the next morning, spoke with her, decided she
was cooperative, and ruled her out as the person responsible for the children's injuries. McMaryion
stated that after she spoke to the police, she talked with Williams, who threatened her by saying "that
if [she] was to blame him, that he would kill [her]."

 Williams had followed McMaryion to Vaughn's apartment and was there when Lopez came
to interview Williams. When Lopez knocked on the door, Williams began "acting like if somebody
that was on the run would act," hid behind the door, and asked Vaughn to tell the police he was not
present. Despite this request, Vaughn let Lopez in and pointed behind the door, where Williams was
hiding. Lopez described Williams's demeanor as defensive, not wanting to come out from behind
the door and "tensing up his arms." 

 Four days later, Lopez had just decided to question Williams again when he received a call
from Dr. Cox, who explained that although cardiopulmonary resuscitation had initially saved R.H.
from one heart stoppage, hospital personnel were unable to revive him after a second heart failure,
and he had died. The autopsy revealed his cause of death to be blunt force injury. Upon learning
of the death, Lopez and his partner returned to the apartment complex in an attempt to locate
Williams, only to discover that no one seemed to know his whereabouts. As they entered an
apartment where they believed him to be located, they saw him leap from its rear window. They
gave chase and located him hiding in a dumpster; he was apprehended only after substantial
resistance to being placed under arrest. 

 At Williams's trial, witnesses brought forth other evidence that S.H. and R.H. had been
previously abused. Vaughn said that Williams had brought S.H. to a barbeque and that he noticed
that she bore a "whelp" on her back. "[I]t was a belt mark and it was about . . . as wide as a ruler and
about as long as a ruler.  . . .  [I]t almost took up her whole back and it was a fresh bruise." When
questioned by Vaughn, Williams admitted he had "whooped" her. Vaughn opined that the bruising
seemed to indicate excessive corporal punishment for a child of that age and that he believed that
it was administered intentionally. 

 Williams argued that the children's injuries might have been administered to them by their
grandmother, Sandra James, or her husband, Johnny James, whom the children had visited in their
home about a week before they were brought to the hospital. McMaryion, Vaughn, and the Jameses
testified that the children appeared unharmed when they had returned from the visit with the
Jameses. 

 However, the day after the children's return home from the Jameses' house, Horton testified
he that saw Williams walking with S.H., who had "her arm wrapped up." McMaryion said S.H.'s
"arm would just hang in the balance." Williams claimed to Horton and McMaryion that S.H. had
dislocated her shoulder while sleeping. Thomas Washington and his wife, Melba, downstairs
neighbors to McMaryion, who were asked to babysit the children, also testified about the injury to
S.H.'s arm, indicating that she had an Ace bandage wrapped around it. Thomas also noted that R.H.
was crying "viciously," while Melba stated he was "whining" and acted like something was wrong
with him. When Williams was questioned by the Washingtons about what happened to the children,
he stated they "had got some shots." When it was time to leave the Washingtons' apartment, S.H.
started crying and acted as if she did not want to leave with Williams. Thomas saw Williams pick
R.H. "up by his arm and . . . [p]ut him across his shoulder" as he left. 

II. The Evidence Was Sufficient To Support Williams's Conviction

 On appeal, Williams argues the evidence was insufficient to convict him of injuring S.H.
because the State failed to "exclude every reasonable hypothesis raised by the evidence that tends
to exculpate the accused." The remainder of Williams's briefing on this issue discussed the
possibility that McMaryion could have been responsible. 

 When conducting a legal sufficiency analysis, we review all of the evidence in the light most
favorable to the verdict and determine whether any rational trier of fact could find the essential
elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979);
Clewis v. State, 922 S.W.2d 126, 132-33 (Tex. Crim. App. 1996). This standard serves as a tool to
determine whether there is a fact issue at all. Clewis, 922 S.W.2d at 133. In other words, if the
evidence is insufficient under the Jackson standard, we must render a judgment of acquittal. Id. 
However, even in situations where the Jackson standard is met, we are not to act as a thirteenth juror,
re-evaluating the weight and credibility of the evidence. Dewberry v. State, 4 S.W.3d 735, 740 (Tex.
Crim. App. 1999). Instead, we must give full play to the fact-finder's responsibility to weigh the
evidence, resolve conflicts in the testimony, and draw reasonable inferences from basic facts. 
Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000); Clewis, 922 S.W.2d at 133; Bottenfield
v. State, 77 S.W.3d 349, 354 (Tex. App.--Fort Worth 2002, pets. ref'd [2 pets.]) (citing Jackson, 443
U.S. at 319). 

 Factual sufficiency is an issue of fact, and we are not free to reweigh the evidence and set
aside a jury verdict merely because we feel a different result is more reasonable. Clewis, 922 S.W.2d
at 135. Instead, we give due deference to the jury's determinations and will find the evidence
factually insufficient only when necessary to prevent manifest injustice. Johnson, 23 S.W.3d at 8-9,
12; Clewis, 922 S.W.2d at 133, 135. Thus, we view the evidence in a neutral light when assessing
factual sufficiency and determine whether the proof of guilt is obviously weak as to undermine
confidence in the verdict, or, if taken alone, is greatly outweighed by contrary proof so as to be
clearly wrong and unjust. Johnson, 23 S.W.3d at 11; Cain v. State, 958 S.W.2d 404, 407 (Tex.
Crim. App. 1997); Harris v. State, 133 S.W.3d 760, 764 (Tex. App.--Texarkana 2004, pet. ref'd). 

 First, contrary to the title in his first point of error, Williams does not argue that the evidence
was insufficient to send the fact question of his guilt to the jury. Instead, Williams points to others
as possible perpetrators of the injuries to the children. This type of argument is better reserved for
factual sufficiency analysis. For lack of adequate briefing, Williams's contention that the evidence
was legally insufficient is overruled. 

 Moreover, the jury was free to reject any implication that some other person caused S.H.'s
and R.H.'s injuries in light of the evidence at trial. See Courson v. State, 160 S.W.3d 125, 128 (Tex.
App.--Fort Worth 2005, no pet.) (citing Zuniga v. State, 144 S.W.3d 477, 483 (Tex. Crim. App.
2004)). Williams previously admitted to the previous abuse of S.H. to Vaughn, was the only adult
at the apartment during the time in which Dr. Cox testified the children were injured, was the only
person questioned by police who appeared to take a defensive attitude with them, and had, according
to Dr. Cox, the physical capability to punch, kick, or throw the child up against the wall. It was
within the jury's purview to find Williams guilty with these facts before them; we will not disturb
this fact finding on appeal because there is no overwhelming evidence suggesting the verdict was
clearly wrong or unjust. See Johnson, 23 S.W.3d at 7; Clewis, 922 S.W.2d at 133. (3)

III. Williams Was Not Harmed by Error in the Jury Charge

 Williams next contends the trial court's failure to properly instruct the jury constituted
fundamental reversible error. Williams was indicted for intentionally or knowingly causing serious
bodily injury to a child in violation of Section 22.04(a)(1) of the Texas Penal Code. See Tex. Penal
Code Ann. § 22.04(a)(1) (Vernon Supp. 2008). Injury to a child is a result-oriented crime because
the focus of the mens rea is on the result of the conduct, not the conduct itself. Banks v. State, 819
S.W.2d 676, 678 (Tex. App.--San Antonio 1991, pet. ref'd). "What matters is that the conduct
(whatever it may be) is done with the required culpability to effect the result." Alvarado v. State, 704
S.W.2d 36, 39 (Tex. Crim. App. 1985). Thus, "it is not enough for the State to prove that [Williams]
engaged in conduct with the requisite criminal intent, the state must also prove that [Williams]
caused the result" intentionally or knowingly. Delgado v. State, 944 S.W.2d 497, 498 (Tex.
App.--Houston [14th Dist.] 1997, pet. ref'd). 

 The distinction between the intent to engage in conduct and the intent to cause the result can
be illustrated by contrasting two similar actions. In one circumstance, a child is thrown from a
balcony by an adult to waiting arms below in an effort to save the child from a raging fire; in another
situation, a child is thrown from a balcony to a concrete walk, prompted by an adult's angry response
to a child's crying. In either circumstance, the action (throwing from a balcony) was intended; in the
first circumstance, however, the intent was not to injure, but to spare the child from injury. Of
course, we also realize that this illustration also contrasts a lawful act against an unlawful one. 

 The instructions in this case, which are the core of this point of appeal, read as follows:

 A person acts intentionally, or with intent, with respect to the nature of his
conduct or to a result of his conduct when it is his conscious objective or desire to
engage in the conduct or cause the result. 


 A person acts knowingly, or with knowledge, with respect to the nature of his
conduct or the circumstances surrounding his conduct when he is aware of the nature
of his conduct or that the circumstances exist. A person acts knowingly, or with
knowledge, with respect to a result of his conduct when he is aware that his conduct
is reasonably certain to cause the result. 


These instructions, while correctly stating the law applying to a crime pertaining to conduct, were
inappropriate to the charge against Williams, a crime which is result-oriented. It is clear, as the State
concedes, that the definitions in the charge erroneously included references to conduct and not to the
result of that conduct. See id.; Green v. State, 891 S.W.2d 289, 294 (Tex. App.--Houston [1st Dist.]
1994, pet. ref'd). If the instructions were taken alone, the jury could convict based on Williams's
intent to engage in conduct without taking into account the motivation or intent to cause serious
bodily injury. This was error. 

 However, a mistake or error in a jury charge does not automatically create reversible error. 
Banks, 819 S.W.2d at 679. Neither does the failure to preserve error in a jury charge bar appellate
review. Warner v. State, 245 S.W.3d 458, 461 (Tex. Crim. App. 2008). Rather, it establishes the
degree of harm that is necessary for reversal. Id. Because Williams failed to object to the charge
at trial, the error will not result in reversal unless it is "so egregious and created such harm that
appellant was denied a fair trial." Id. "Errors that result in egregious harm are those that affect 'the
very basis of the case,' deprive the defendant of a valuable right,' or 'vitally affect a defensive
theory.'" Id. at 461-62. In determining whether egregious error exists, every charge error must be
assessed in light of "the entire jury charge, the state of the evidence, including the contested issues
and weight of the probative evidence, the arguments of counsel and any other relevant information
revealed by the record of the trial as a whole." Id. at 461.

 We note that immediately following the erroneous definition, however, the charge proceeds
to instruct the jury further. Here, the charge directed the jury to find Williams guilty only if it found
"beyond a reasonable doubt that on or about June 27th, 2006, in Dallas County, Texas, the defendant
knowingly or intentionally caused serious bodily injury to [S.H.]." Therefore, although there was
a definition included in the charge which was inappropriate, the charge did not allow the jury to
convict on a finding that Williams intended to kick, punch, or throw the child up against the wall. 
Rather, the jury was required to find that Williams intentionally or knowingly caused serious bodily
injury to S.H. Given the severe nature of the injuries sustained by S.H., one might presume that most
jurors would consider the difference between an intention to commit the act of striking S.H. or
slamming her against the wall and the intention to injure her somewhat pedantic; the kind of force
obviously employed to have caused the kind of injuries she sustained would almost certainly have
been accompanied by the intent to injure. Because the application paragraph does not allow
conviction based solely on a finding that Williams intentionally or knowingly engaged in conduct,
there was no further error in the charge. (4)

 This finding is consistent with other cases decided by our sister courts. In Green, identical
definitions of knowingly and intentionally were presented to the jury in a case dealing with the
result-oriented offense of aggravated assault causing serious bodily injury. 891 S.W.2d at 293. 
Although it was error to submit the instructions, the court found no resulting harm because the
application paragraph correctly instructed the jury to convict the defendant if it found that he
"intentionally or knowingly cause[d] serious bodily injury" to the victim. Id.; see also Sanchez v.
State, No. 01-93-00962-CR, 1995 WL 500400, at *2-3 (Tex. App.--Houston [1st Dist.] Aug. 24,
1995, pet. ref'd) (not designated for publication). 

 As previously discussed, the state and weight of the evidence is sufficient to support the jury's
verdict. Green, 891 S.W.2d at 293. Dr. Cox stated the injuries were probably caused by kicking,
punching, or throwing the child against the wall. The jury could find beyond a reasonable doubt that
any person committing these acts intended for the child to receive serious bodily injury. 

 During voir dire, the State said, "In the indictment you guys heard me read intentionally and
knowingly. We have to prove the Defendant intended to do his actions or knowingly did his actions,
did what caused the injury to this child." While the State failed to emphasize that the mens rea
requirement is tied to an intention to create the result (as opposed to intending to commit the act),
the reading of the indictment buffered the impact of the error and ameliorated the impact of the
erroneous instruction. Further, Williams "presented no defense which would directly effect an
assessment of his conduct, i.e. . . . that he did not intend the result," and neither the State nor
Williams's counsel compounded the error by emphasizing the erroneous instruction in opening or
closing argument. See Mena v. State, 749 S.W.2d 639, 642-43 (Tex. App.--San Antonio 1988, pet.
ref'd) (concluding no harm when instructions identical to this case were given to jury in result-oriented offense case); see also Saldivar v. State, 783 S.W.2d 265, 268 (Tex. App.--Corpus Christi
1989, no pet.) ("Where no defense is presented which would directly affect an assessment of mental
culpability, there is no harm in submitting erroneous definitions of 'intentionally' and 'knowingly.'");
Spang, 781 S.W. 713. Also, there is no other information in the record that supports the conclusion
that the error was egregious. Green, 891 S.W. 2d at 293, 295. 

 Perhaps if Williams had based his defense upon a claim that the injuries sustained by S.H.
were occasioned by benign conduct (such as overzealous attempts at cardiopulmonary resuscitation
on a child who had ceased breathing), the difference between the intention to commit the act and the
intent to harm would have made a difference to a jury and been relevant to its determination of guilt. 
The thrust of Williams's defense, however, was that he had done nothing untoward to the children
and that any injury they sustained had been caused by someone else. 

 Based on the factors addressed above, we conclude that Williams was not egregiously
harmed by the erroneous instructions in the jury charge. 

IV. Williams Did Not Receive Ineffective Assistance of Counsel 

 Any allegation of ineffectiveness must be firmly founded in the record. Goodspeed v. State,
187 S.W.3d 390, 392 (Tex. Crim. App. 2005); Thompson v. State, 9 S.W.3d 808, 813 (Tex. Crim.
App. 1999). From the record received by this Court, Williams bears the burden of proving by a
preponderance of the evidence that counsel was ineffective. Goodspeed, 187 S.W.3d at 392;
Thompson, 9 S.W.3d at 813; Cannon v. State, 668 S.W.2d 401, 403 (Tex. Crim. App. 1984). We
apply the two-pronged Strickland test handed down by the United States Supreme Court to determine
whether Williams received ineffective assistance of counsel. Strickland v. Washington, 466 U.S. 668
(1984). Failure to satisfy either prong of the Strickland test is fatal. Jaubert v. State, 74 S.W.3d 1,
9 n.2 (Tex. Crim. App. 2002). Thus, we need not examine both Strickland prongs if one cannot be
met. Strickland, 466 U.S. at 697. 

 Williams must show counsel's performance fell below an objective standard of
reasonableness when considering prevailing professional norms. Id. at 687-88. "This requires
showing that counsel made errors so serious that counsel was not functioning as the 'counsel'
guaranteed the defendant by the Sixth Amendment." Sanchez v. State, No. 07-06-0435-CR, 2008
WL 2405889, at *1 (Tex. App.--Amarillo June 13, 2008, no pet.) (mem. op., not designated for
publication) (quoting Strickand, 466 U.S. at 687). Our review of counsel's performance is highly
deferential. Ex parte White, 160 S.W.3d 46, 51 (Tex. Crim. App. 2004). There is a strong
presumption that counsel's conduct fell within the wide range of reasonable professional assistance
and that the challenged action could be considered sound trial strategy. Strickland, 466 U.S. at 689;
White, 160 S.W.3d at 51; Tong v. State, 25 S.W.3d 707, 712 (Tex. Crim. App. 2000). Therefore, we
will not second-guess the strategy of counsel at trial through hindsight. Blott v. State, 588 S.W.2d
588, 592 (Tex. Crim. App. 1979); Hall v. State, 161 S.W.3d 142, 152 (Tex. App.--Texarkana 2005,
pet. ref'd). Where the record is silent as to why counsel failed to make an objection or take certain
actions, we will assume it was due to any strategic motivation that can be imagined, and the
appellant will have failed to rebut the presumption that trial counsel's actions were in some way
reasonable. Mata v. State, 226 S.W.3d 425, 431 (Tex. Crim. App. 2007); Garcia v. State, 57 S.W.3d
436, 441 (Tex. Crim. App. 2001); Fox v. State, 175 S.W.3d 475, 485-86 (Tex. App.--Texarkana
2005, pet. ref'd). In other words, we will not conclude the challenged conduct deficient unless it was
so outrageous that no competent attorney would have engaged in it. Thompson, 9 S.W.3d 808; Fox,
175 S.W.3d at 485-86. 

 Next, it is not enough for Williams to show that the errors had some conceivable effect on
the outcome of the proceeding. See Strickland, 466 U.S. at 693. To meet the second prong of the
Strickland test, Williams must show that the deficient performance damaged his defense to such a
degree that there is a reasonable probability the result of the trial would have been different. See id.;
Tong, 25 S.W.3d at 712. We evaluate this factor while taking into consideration the totality of
representation and the particular circumstances of this case. Thompson, 9 S.W.3d at 813; Ex parte
Felton, 815 S.W.2d 733, 735 (Tex. Crim. App. 1991). 

 Even absent a record as to why counsel failed to object to the definitions, there is no question
that Williams can meet the first prong of the Strickland test. See Banks, 819 S.W.2d at 682. At the
time of Williams's trial, the law was clear that injury to a child was a result-oriented offense and that
he would be entitled to limit the definitions of the culpable mental states upon objection. See id. 
In this precise situation, "it cannot be argued that counsel's course of conduct was within the realm
of trial strategy." Id. Under the facts of this case, the intent to commit the act was tantamount to an
intention to commit the injuries. Thus, counsel's conduct in failing to object to the definitions "was
without any plausible basis." Id. 

 However, because we have concluded the application paragraphs of the charge focused the
jury on the result of Williams's conduct instead of the nature of his conduct, we conclude Williams
was not harmed by the erroneous definitions. Therefore, Williams fails to meet his burden that there
was a "reasonable probability that but for the error, the result would have been different." See Green,
891 S.W.2d at 299; Sanchez, 1995 WL 500400, at *3; Browning v. State, No. 01-93-00897-CR, 1995
WL 477546, at *9 (Tex. App.--Houston [1st Dist.] Aug. 10, 1995, pet. ref'd) (not designated for
publication). We overrule this point of error. 

V. Conclusion

 We find the evidence in this case was legally and factually sufficient to support Williams's
conviction. While the failure to limit the definitions of "knowingly" and "intentionally" in this
result-oriented offense was error, it was harmless since the application paragraphs correctly charged
the jury with respect to the required mental culpability. Because the error was harmless, Williams
cannot demonstrate that he received ineffective assistance of counsel. 

 We affirm the judgment of the trial court. 





 Bailey C. Moseley

 Justice


Date Submitted: February 19, 2009

Date Decided: February 25, 2009


Do Not Publish


1. There is a companion case to this (our cause number 06-08-00135-CR) which regards the
serious injury inflicted by Williams on the six-month-old brother of the victim here, who died while
being treated for the injuries he sustained. Williams was sentenced to fifty years' imprisonment, to
run concurrently with the sentence in this case, plus a $10,000.00 fine. 
2. This case was transferred to this Court by the Texas Supreme Court pursuant to its docket
equalization efforts. See Tex. Gov't Code Ann. § 73.001 (Vernon 2005). We are unaware of any
conflict between precedent of the Fifth Court of Appeals and that of this Court on any relevant issue. 
See Tex. R. App. P. 41.3.
3. In addition to suggesting that the children's mother was responsible, Williams argues for the
first time on appeal that it is improbable Williams beat the children because he only had five minutes
to do so after the time McMaryion left the apartment before Horton arrived. He also claims the
medical examiner's findings that R.H.'s broken bones showed some sign of healing undermined the
jury's verdict. This is contrary to Dr. Cox's analysis that the injuries occurred between 3:00 and
6:00 p.m. and fails to account for his explanation that the signs of healing probably occurred while
R.H. was in the hospital. The jury was free to disbelieve Williams's position. We do not find this
evidence undermined the jury's verdict. 
4. We distinguish this case with those cases cited by Williams in his briefing. In all of the
cases cited by Williams addressing this issue, the application paragraph of the charge erroneously
allowed conviction based on a finding that the defendant "knowingly and intentionally engage[d] in
conduct that caused" the result, i.e., bodily injury. Haggins v. State, 785 S.W.2d 827, 827-28 (Tex.
Crim. App. 1990); Kelly v. State, 748 S.W.2d 236, 237-38 (Tex. Crim. App. 1988); Alvarado, 704
S.W.2d at 37; Beggs v. State, 597 S.W.2d 375, 376-77 (Tex. Crim. App. [Panel Op.] 1980); Banks,
819 S.W.2d at 678. But see Spang v. State, 781 S.W.2d 713 (Tex. App.--Austin 1989, no pet.)
(affirming conviction); Samples v. State, 762 S.W.2d 751 (Tex. App.--Fort Worth 1988, no pet.)
(no discussion of application paragraph).