

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-08-263-CR

LINDA CUVILLIER                                                          APPELLANT

V.

THE STATE OF TEXAS                                                            STATE

------------

### FROM THE 371ST DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### Introduction

Linda Cuvillier brings eight points in her appeal of her conviction and twenty-year sentence for aggravated assault of a family member, her great-aunt Irene Garrett. She challenges (1) the legal and factual sufficiency of the evidence to prove that she was the perpetrator, (2) the admission of Irene's medical records, testimony from a paramedic regarding statements Irene made

---

[1] *See* Tex. R. App. P. 47.4.

during treatment, and testimony regarding an extraneous offense, and (3) the trial court's failure to give requested limiting instructions. We affirm.

## Legal and Factual Sufficiency of the Evidence

In her first and second points, appellant challenges the legal and factual sufficiency of the evidence to prove that she was the person who committed the offense.

**Standards of Review**

In reviewing the legal sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party. *Neal v. State,* 256 S.W.3d 264, 275 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 1037 (2009); *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the factfinder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly

2

outweighs the evidence supporting the conviction that the factfinder's determination is manifestly unjust. *Lancon v. State*, 253 S.W.3d 699, 704 (Tex. Crim. App. 2008); *Watson*, 204 S.W.3d at 414–15, 417. To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, though legally sufficient, contradicts the verdict. *Watson*, 204 S.W.3d at 417.

**Applicable Facts**

Irene was eighty-four at the time of trial and a widow. She testified that she used to live alone in a house on Northwest 23rd Street in Fort Worth, and appellant would occasionally visit her. One evening, in May 2007, appellant came over, and Irene let her inside. After appellant came inside, she hit Irene over the head with a baseball bat[2] and said, "Shut up." Irene thinks she was knocked unconscious. She did not know how many times she was hit, but she did get a broken arm, jaw, and nose. As a result of her injuries, she was still using a walker at the time of trial and had trouble hearing out of her left ear.[3] She also had dizzy spells "all the time" that she had not had before.

The following exchange occurred on cross-examination:

---

[2] Irene testified that she kept a bat in her house that her cousin had given her for protection.

[3] It is clear from the record that Irene still had a hard time hearing, especially when the defense cross-examined her.

3

[Defense]: Okay. Where in the house were you when [appellant] came over?

[Irene]: I was in the bed.

[Defense]: Is that where you were when she hit you?

[Irene]: Yeah, on the back room. They said they found me in the back room.

[Defense]: They said? Who's they?

[Irene]: Well, it's where the . . . police found me, and the ambulance took me to the hospital, and she was . . . chasing her boyfriend with a butcher knife, and he - -

[Defense]: Let me - - you were unconscious, though, right? So who told you the story?

[Irene]: Well, anyway, he told . . . the cop that - -

[Defense]: Ms. Garrett, let me stop you for just one second. Okay, ma'am? You said you were unconscious, right?

[Irene]: Yeah.

[Defense]: Okay. Who told you *the story you're telling me now*?

[Irene]: It was after . . . I was conscious and in the hospital. They said - - the cop - - they told the cop, "There's a lady down there on Northwest 23rd Street in a pool of blood. I don't know if she's dead or alive." And the cops come and found me, and then the ambulance took me to the hospital.

[Defense]: Okay. But those aren't your memories, are they?

[Irene]: No.

4

[Defense]: That's what other people told you afterwards?

[Irene]: Yeah.

. . . .

[Defense]: *And you remember seeing [appellant]?*

[Irene]: *Yeah*.

[Emphasis added.]

When shown a photograph of her front door and asked if it looked as if it were broken around the door handle, Irene answered, "No, not really." She was also shown a picture of a gun on a table inside her house; she answered that it was not her gun. When asked if she knew anyone who did have a gun, Irene answered, "She did." But it is unclear who "she" refers to.

Through Judy Thomas, a custodian of medical records at JPS Health Network, the State introduced, and the trial court admitted, the medical records from Irene's admission to John Peter Smith Hospital. The records contain several notations indicating that Irene's niece hit her with a baseball bat.

Bobby Mills, the brother of appellant's friend Jerald Mills, testified that on May 22, 2007, he let Jerald drive his car. When he needed it back after work that night, his father drove him to appellant and Jerald's house to pick it up.

5

Around 6:00 or 7:00 that evening, Bobby drove appellant in his car[4] to her "Aunt Irene's" house on 23rd Street. When they arrived at the house, appellant's broken down, red Mustang was in the driveway. Bobby waited while appellant went inside; she knocked on the door and then went inside when no one answered. When she came out, she was holding a baseball bat. When she got to Bobby's car, she leaned on the bat and then told Bobby "she messed up" and that "she thought someone broke in the house" and "beat her brain." Although appellant tried to get into the car with the bat, Bobby left and went to get Jerald.

Jerald did not believe Bobby when he told him what appellant had said, so, at Jerald's direction, Bobby went back to Irene's house alone. When he arrived, appellant did not have the bat with her. She would not get in the car with Bobby, so he left and went back to get Jerald. When Bobby and Jerald arrived at Irene's house, appellant tried to put the bat and a "big old stuffed doll" in his car.[5] Bobby did not want her to put those things in his car, so at Jerald's urging, he left appellant and Jerald at Irene's house and went home. Before Jerald told him to leave, however, he saw Jerald make a call on his cell

---

[4] According to Bobby, he "scrapped" the car about a month later.

[5] Irene had testified that she had a large, almost adult-sized doll in her bedroom, which her daughter had made.

phone; Jerald told Bobby he was calling 911. Bobby never saw anyone other than appellant come out of Irene's house, and he never saw Jerald go inside. Both the State and appellant asked Bobby questions about his prior convictions for DWI and misdemeanor theft and assault.

Immediately upon calling Jerald to the stand, the State questioned him about his prior aggravated assault and misdemeanor assault convictions. Jerald admitted that he had been convicted of these offenses but no others. Jerald then testified that on May 22, 2007, he and appellant were at her house, and he was working on a truck for her. He did not have a working vehicle, so he borrowed Bobby's car to run some errands during the day. Appellant asked him to get drugs for her too, but he did not help her get any. Jerald testified that he picked Bobby up from Bobby's boss's house that night and took him back to appellant's house. According to Jerald, Bobby and appellant then left together.

Jerald said that appellant asked Bobby to drive her to buy drugs, and Jerald told Bobby not to take her. After arguing about it for awhile, though, he finally told Bobby to take appellant but to come back if she could not find any drugs. But Bobby came back alone within "a couple of minutes." Bobby told Jerald why he came back, and Jerald told him to go back and get appellant.

7

When Bobby came back alone a second time, Jerald got in the car and went with him to "Aunt Irene's" house on 23rd Street.

According to Jerald, when he and Bobby arrived at the house, appellant was out front with "like a green thing and a bat."[6] She wanted to put the bat in Bobby's car, but Jerald "didn't feel good about that." He told her to take the bat and leave; he then pretended to call the police and told Bobby to leave. However, appellant would not leave. Jerald left and walked back to appellant's house. He was there alone for between four and six hours.

At some point, Jerald decided to go buy some cigarettes; on the way to the store, he went out of his way to pass by Irene's house, and he noticed a light on. He had been worrying about whether appellant actually did what she told Bobby she did. After he got his cigarettes, he went back by Irene's house; appellant's red Mustang was in the driveway. A light was on, which he thought was unusual at that time of night. As he was walking by the house, he heard someone call his name, and when he walked over, it was appellant. She was standing in front of the red Mustang. Jerald asked appellant what was going on; according to Jerald,

---

[6] He later described the "green thing" as having tools in it.

8

I kept asking her and asking her, and she had like this doll thing,[7] and she threw it down on the ground and like stuck its hands behind its back, and I kept asking her what's going on, and she just kept giving these weird looks like I don't know. I kept asking her, and she goes, "You open the door and look." And I said, "I'm not going to open the door. You open the door." So we both walked up there. She opened the door. I looked to the left and I seen Aunt Irene there.

Jerald said that because Irene's house was small, he only had to walk in a couple of steps before he was able to see her. Irene's eyes were "all bloody and her head, and she had like cover on her from here down, and she just kept asking for a drink of water." Jerald felt sick when he saw her.

After Jerald left the house, he fainted. When he came to, appellant was standing over him, telling him he had better get up, which terrified him. He ran back to appellant's house, packed a duffel bag, and started walking back to Irene's house. On direct he testified that at some point he became afraid for himself and called 911 "to turn [appellant] in and tell the police what happened." It was after midnight on May 23 when he finally called 911.

The State played the 911 call for the jury. On it, Jerald is excited, eventually becoming hysterical and crying. He told the 911 operator that appellant was chasing him, and she had a knife "or somethin'." He also said

---

7 Jerald explained that the doll was adult-sized.

9

appellant had "beat up" her aunt with a baseball bat and that she was on drugs "real bad."

On cross-examination, Jerald explained that when he neared Irene's house, he heard something "like a foot scrapes on the ground"; the sound turned out to be appellant. Jerald said in his 911 call that appellant was chasing him with a knife; he admitted he had since said he did not actually see a knife, but testified that "[t]here was something . . . [that] looked like a knife." He also testified that appellant chased him down the street but then hid around a house on 22nd Street.

Jerald denied giving appellant any medication on May 22, 2007. He was firm in contending that Bobby was gone for only about two minutes before he came back telling Jerald that appellant told him she had messed up and beaten someone to death. After being shown photographs of appellant taken that night, Jerald agreed appellant had cuts on her arms and hands, but he denied knowing how those cuts got there. According to Jerald, the cuts were on appellant's arms when he was over at her house during the day. He denied having a cut on himself that night and also denied that a spot on the sole of his shoes was blood. He denied trying to make appellant get in the car with him and Bobby.

10

On May 23, 2007, around 1:00 a.m., Fort Worth Police Department Officers Roger Ballard and Ann Hall responded to the area around Irene's home based on a 911 report of a person with a weapon. Officer Ballard testified that when they arrived at a nearby business, they found Jerald Mills, holding "some sort of a bag" and a fishing pole and standing in the middle of the intersection waving his arms. He was "hysterical"; his voice was high-pitched, he was yelling, and he was scared. Jerald did not appear to be injured, but his "main concern" was that his girlfriend, later identified as appellant, had a knife and was chasing him. Officer Ballard did not think Jerald was under the influence of any substances.

Jerald directed the officers to a house one block away from Irene's; the officers found appellant walking from that house towards the street. She was calm but appeared to Officer Ballard to be "Jonesing." After the officers detained her and placed the two in separate cars, Jerald "started yelling" at Officer Ballard to check on appellant's "Aunt Irene." He told Officer Ballard that appellant had "beaten [Irene] to death with a baseball bat." Jerald then directed Officer Ballard to Irene's house.

When Officer Ballard arrived at the house, the front door was open. He knocked, identified himself as a Fort Worth police officer, and stepped inside after he did not receive a response. In a bedroom, which was not far inside the

11

house and to the left of the front door, he found Irene "lying on the bed in a large puddle of blood." He did not notice any injuries other than to her head. Based on her appearance, though, he thought she was dead.

On cross-examination, Officer Ballard admitted that the officers searched the area that night but never found a knife or the bat. He went to Irene's house later with a crime scene officer; the only place he saw blood was in the bedroom and on the doorway between the bedroom and bathroom. He did not think the front door looked like it had been broken into. Officer Ballard did not notice any blood on Jerald or appellant, but he also said he did not "examine" either one of them. He also never saw a gun in the house.

Officer Hall testified that she pat down appellant after she emerged from the side of the house where Jerald told the officers she was hiding, but Officer Hall did not find any weapon on appellant. Appellant was coherent and able to follow instructions. Officer Hall did not notice any cuts or injuries on appellant or Jerald. Appellant was excited, but not as excited as Jerald, and neither of them appeared to be under the influence of any substances.

Paramedic John Mark Garner testified that he responded to a call at 2719 Northwest 23rd Street around 1:00 a.m. on May 23, 2007. The only people he saw at the house were police officers and firefighters. When he first walked in, he was in a small living room; the officers then directed him and his partner

12

to a small side room where Irene was on the bed. Her head was in a pool of partially clotted blood at the head of the bed. Irene was conscious and alert, but her face was very bloody and swollen; some of the blood had clotted. She was very scared, and she could not see because her eyes were completely closed; the paramedics had to pry them open.

Irene complained about pain in her head, abdomen, left arm, back, neck, and face. She did not have any injury indicating that she might have been restrained. To evaluate Irene's potential for a head injury, Garner asked her what happened. She told him that her niece, appellant, "had done this with a baseball bat."

On cross-examination, Garner admitted that sometimes older people can have trouble with questions after trauma due to hearing loss or some other factor such as Alzheimer's. But he contended that if an elderly patient gave a seemingly incorrect answer to a question, he would repeat the question to make sure he or she understood. He explained that if a person can identify his or her attacker, it shows a "very high functioning level of their cognitive function." He admitted that he would have no way of knowing whether that person's answer was truthful without any corroborating information. He also admitted that blood loss could cause a loss of cognitive function but that its effects differ from person to person. He explained that Irene was "completely

13

alert and oriented . . . [, and] very cognizant and coherent," but that she could have forgotten speaking to him if she had a slow brain bleed instead of a fast one.

Garner told the defense that Irene's injuries were disturbing to him because of her age and because she had numerous injuries; he described it as having been "clobbered." In his opinion, her injuries were consistent with having been hit multiple times with a baseball bat.

Detective James Varnon of the Fort Worth Police Department testified that he did the crime scene investigation in the case; he arrived at Irene's house around 2:00 a.m. on May 23. He collected a glass with blood on it from the bed, a ball cap lying in the driveway outside, and a life-sized cloth doll from the bedroom. Although he looked around the perimeter of the house that night, he did not find anything of significance. He did not find any evidence of forced entry into the home. He did, however, take photographs of appellant and Jerald. According to Detective Varnon, if he had seen blood on anyone's clothes or shoes, he would have collected those items. Most of the blood was on the bed and the floor beside the bed; there was no blood trail leading to any other rooms. He did not find either a baseball bat or a knife.

On cross-examination, Detective Varnon admitted he examined appellant and Jerald in the dark with a flashlight and possibly could have missed spots

14

of blood on their clothes or shoes. He never saw a duffel bag with Jerald; if he had, he would have thought it was important enough to be searched. Detective Varnon said that a blood spatter on the wall could have indicated multiple possibilities: Irene was hit in the hallway, she was hit lying down or she was bleeding while close to the floor, she was hit and then fell to her knees and was hit again, or she "huffed" blood from her face and nose onto the wall.

Detective Varnon testified that he did not collect a rope of indeterminate material hanging on the bed frame as a result of a conversation between him and Officer Ballard; he could not explain why it was there, and admitted it could have been used as a restraint. He did opine that a gun on one of the tables, which was shown in photographs of Irene's house, was a toy because it had a yellow plastic piece over the muzzle. Also, Detective Varnon believed that the scrapes on the door were old and that if a break-in had been attempted, it did not happen recently. He opined that the scrapes on appellant's arms had occurred within a few hours. He did not find a knife. The doll he collected was clean and did not appear to have any stab marks on it.

Detective Kimberly Stamp was assigned to investigate Irene's assault. She initially went to JPS to interview Irene, but Irene had been sedated and was unable to speak. Instead, Detective Stamp spoke with Irene's daughter Dorothy Estep. From talking to Estep, she received information that the police needed

15

to retrieve a baseball bat at Irene's house. She and Sergeant Brandon Johnson then went to Irene's house to get the bat; when they found it, there was a board over it.

When Detective Stamp was able to interview Irene, Irene's daughter Barbara had to repeat the questions to Irene, who answered only yes or no. But according to Detective Stamp, Barbara repeated the questions exactly as Detective Stamp asked them. Detective Stamp collected a DNA sample from Irene, which the crime lab tested against blood samples taken from the bat.[8]

On cross, Detective Stamp admitted that no one ever found a knife and that no samples had been taken from the part of the bat where someone would hold it. No one collected the rope-like pieces hanging from the bed, and no one tested the glass that was found. Detective Stamp never went inside the house. She interviewed both Jerald and Bobby but only for about 12-15 minutes or less.[9]

Detective Stamp did not know if anyone searched the duffel bag Jerald had. She recalled Bobby telling her that appellant knocked on the front door of

---

[8] An analyst for the Fort Worth police crime lab tested the stains on the bat and confirmed they were blood; he then sent the samples to UNT Health Science Center for DNA testing. A forensic analyst at UNT testified that the DNA test confirmed that the blood was Irene's. Neither was asked to test any other part of the bat.

[9] When Detective Stamp interviewed Jerald, he was still upset.

16

Irene's house then went around to the side and that he thought she went in the house through a window.

Detective Stamp agreed that when she asked Irene if a man had been in the house that night, she said, "yes." But she also responded, when asked who "did this" to her, "My sister's daughter, Loretta."[10]

Sergeant Johnson testified that on May 24 or 25, 2007, the day after Irene was assaulted, he went to her former home with Detective Kimberly Stamp to look for the baseball bat. The detectives found the bat in the front yard to the left of the driveway underneath some bushes. They also found a two by four, which was either lying next to or on top of the bat. The crime scene had not been secured the night before.

Irene's daughter Dorothy testified that she and her husband found the bat at Irene's house on the evening of May 23 and immediately called Detective Stamp. They did not touch the bat or move it. According to Dorothy, her mother was a gardener and had a "pretty lush front yard."

After speaking to her mother at the hospital, Dorothy spoke with Detective Stamp. Her mother's condition was so serious that the hospital put her into a semicoma in ICU. She could not breathe without the assistance of

---

[10] Appellant's middle name is Loretta, which is how Irene would refer to her.

a respirator,[11] and she needed a blood transfusion. Because Irene had a living will, the family decided to have the respirator turned off, expecting her to die. Although Irene was able to live without life support, she remained at JPS for "quite some time" and was released to physical therapy to learn how to walk and sit up. She could no longer live independently as she had before the assault, and she had hearing loss.

George Garrett testified that he knew Irene because she had been married to his cousin. George had lived with Irene off and on in 2007 and helped her around the house. George had given the bat to Irene to protect herself with; she kept it by the front door. When George lived with Irene, he lived in a room at the back of the house with a back door leading into it. According to George, Irene kept a two by four, similar to the one the police found in the front yard, across the door to make sure no one could get in.

George got a job in Springtown starting May 23, so he had his cousin pick him up the day before and take him there.[12] He stayed in Springtown overnight. He became worried when he tried to call Irene and she did not answer, so he called his friend Roy Dennis to check on her. Roy picked George

___

[11] Dorothy said an emergency room doctor told the family Irene needed the respirator or she would die.

[12] In contrast to George's testimony, Irene testified that George was not living with her at the time.

up at the Dairy Queen after George got a ride there and took him to Irene's house and eventually to the hospital to see Irene. He thought he had been in Springtown only one day.

Roy Dennis testified that George told him that he had been working in Springtown on May 23, 2007. When Roy first went to Irene's house, she was not there. He saw two police officers on mounted patrol and told them why he was there; they looked around the yard and the house and then called more officers to the house, who opened the door. Roy saw signs of blood and called George to tell him to come home. Roy and his girlfriend drove to meet George halfway; Roy knew George had been working because he was dirty. Roy then got George cleaned up and took him to JPS to see Irene.

Michael Riley testified for the defense. He lived on the corner of 23rd Street and Kearney, two houses north of Irene's and close enough to see her house from his backyard. About 10:45 or 11:15 p.m. on May 22, he let his dogs out into the backyard and heard a "ruckus." He went around to the front and saw a white car heading toward Kearney on 23rd; there were one or perhaps two people in the car. Although he said it was "very dark" and "very late,"[13] he also stated unequivocally that whoever was in the car was male, and

---

[13] Riley also testified that he has lights around his property that allowed him to see the area.

19

he could see a light inside, like a cell phone being activated.  He could also see a white female walking up the street "[t]rying to get away from the white car."  According to Riley, there was shouting going on, as if the people were quarreling, but he could not recall the exact words that were being said.  He thought it looked like a "lover's quarrel."  The woman appeared to be running away from the man in the car, and she seemed upset.  He saw an ambulance at Irene's "a few minutes after that."

On cross, Riley admitted that the event had occurred in the springtime, but he did not remember the exact date.  He also admitted there is a lot of car and foot traffic in the neighborhood.  The car looked like a late 80s model Oldsmobile, Chevrolet, or Chrysler.[14]

Appellant testified that she was very close to Irene.  She denied hitting her.  According to appellant, on May 22, 2007, she was in the middle of moving, and Jerald was staying at her house for a few days.[15]  She did not go anywhere that morning because she had a severe headache.  Jerald went out and brought back $30 and two pills, which she thought were Tylenol.  Around

---

[14] Bobby had testified that his car was a white Oldsmobile Cutlass Ciara.

[15] Appellant later testified on cross that she and Jerald spent the night on the 21st at the Motel Six.

20

1:00 or 2:00 p.m., her son came over and brought some meat to barbecue; about twenty or thirty minutes later, she lay down and passed out on her bed.

Appellant testified that she woke up about three or four hours later. She tried to help Jerald with the truck, but she was too tired, and she fell asleep again around 5:00 or 6:00 p.m. According to appellant, Jerald left the house when it was almost dark, and she "passed out again." She woke up when it was "pretty late" and left the house to go to a convenience store. On her way back, she got a ride from a man she had known "for quite some time."[16]

The man took her home, and she went inside and left the Coke and cigarettes she had bought. She then got back in the car and went riding around for about twenty minutes until the man dropped her off at Irene's house. According to appellant, she usually spent the night at Irene's house because she was scared to stay at her own home.

Appellant said that when the man dropped her off at Irene's, she saw a white car[17] there and was kind of scared but got out of the car anyway. After she got out, she saw Jerald coming out from in front of her car that had been parked in the driveway; he was "acting real angry, and then he would start

---

[16] She later identified him on cross as Louis Mejia.

[17] Appellant recognized the car as the one Jerald and Bobby drove.

21

crying and screaming, crying, and then he would act angry." Appellant left and went up the street.

Appellant testified that, with Jerald following her in the white car, she ran around the corner to a house where she had seen a man pull into the driveway. She had to run through some bushes to get to the house. She knocked on the door, but the man did not answer, so she went around to the back, but the man had already gone inside. According to appellant, she then went back around to the front and saw Jerald; he had duffel bags and was "whapping" a fishing rod at the street and her, hitting her a couple of times. He said he was calling the police. She tried to get away from Jerald for about twenty minutes.

Appellant testified that Jerald had hit her before.

According to appellant, she stayed in a driveway by a house on 22nd Street until the police came, at which point she came out to meet them. They handcuffed her immediately.

On cross, appellant admitted that Bobby came over to her house, but she denied going to Irene's house with him. She did not try to go into Irene's house to escape Jerald because the light was out, and she thought Irene had gone somewhere else to spend the night.

**Analysis—Legal Sufficiency**

Appellant's legal sufficiency point merely summarizes the evidence without providing argument as to why the evidence is legally insufficient. In her recitation of the facts, however, she does point to (1) the fact that the police did not investigate any persons other than appellant and did not test some of the items they found at the scene for fingerprints or DNA, (2) alleged inconsistencies in Irene's medical records, (3) the fact that the police never found a knife or any other weapon to corroborate Jerald's testimony and never checked the duffel bag or bags he was carrying, (4) the fact that both appellant and Jerald had scratches on their hands that night, and (5) the lack of security around the crime scene before the officers retrieved the bat.

Appellant's argument, then, appears to focus on what was *not* in evidence rather than the evidence that was actually admitted at trial, which is what we must rely upon in performing both a legal and factual sufficiency review. Here, the jury was entitled to believe Irene's unequivocal testimony that appellant hit her with a baseball bat, causing her injuries, and to disbelieve appellant's testimony; moreover, we must defer to the jury's resolution of any conflicts in the testimony. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); *Schmidt v. State*, 232 S.W.3d 66, 68 (Tex. Crim. App. 2007). We hold that the evidence is legally sufficient to support the jury's determination that appellant committed the offense. We overrule appellant's first point.

23

**Analysis — Factual Sufficiency**

In her second point, appellant argues that

> [c]onfusion about the mysterious knife goes to Jerald Mills['s] credibility. Police officers left many things undone because they had a suspect, even though the person who initially pointed the finger at [a]ppellant turned out to be less than credible. The crime scene was left unsecured for hours or days, depending on the particular witness testifying, and the most damning piece of evidence against [a]ppellant is miraculously found later by civilian witnesses. There was DNA testing that wasn't done, not because it wasn't feasible, but simply because the police didn't bother to request it.

Thus, appellant argues, the evidence was so weak that her conviction was clearly wrong and manifestly unjust, or, alternatively, that it was against the great weight of the evidence.

Even viewing the evidence in a neutral light, Irene's testimony is sufficient to prove appellant's identity as her assailant; thus, the evidence is not too weak to support the verdict even under a factual sufficiency standard of review. Although appellant claims Irene's testimony was confusing as to whether she was only stating what other people told her, it is clear that her references to other people telling her stories were related to *after* appellant hit her and she lost consciousness (i.e., stories about the police finding her and appellant's chasing Jerald with a knife). Her testimony about what happened before the attack was clear and unequivocal.

Likewise, the lack of any further police investigation is not as significant here in light of Irene's unequivocal and unwavering identification of appellant as her attacker and in light of the fact that the investigation that was done corroborated Irene's story. And although there are inconsistencies between Jerald's and Bobby's versions of events—and defense witness Michael Riley's—those inconsistencies are not so compelling as to outweigh Irene's testimony and the other evidence supporting the verdict. We conclude that although there is some evidence contrary to the jury's verdict, it is not so great as to render the verdict factually insufficient. *See Lancon*, 253 S.W.3d at 704; *Watson*, 204 S.W.3d at 414–15, 417. We overrule appellant's second point.

**Irene's Medical Records**

In her third through fifth points, appellant contends that the trial court abused its discretion by admitting all of Irene's medical records related to her treatment for the assault because they were substantially more prejudicial than probative, because they violated appellant's Sixth Amendment Confrontation Clause rights, and because they contain inadmissible hearsay statements indicating that Irene's niece was the attacker. In her seventh point, appellant contends the trial court erred by failing to grant her request for a midtrial limiting instruction restricting the jury from considering the records for any

purpose other than the fact that Irene was admitted on the dates listed in the records.

**Admissibility under Rule 403**

At trial, appellant argued that in light of Irene's testimony that appellant was the person who hit her with the bat, admission of the records containing references to Irene's niece hitting her with a bat was repetitive, confusing, and served only to bolster Irene's testimony by lending the credibility of the medical professionals whose notes were memorialized in the records. But although appellant brings a point on 403 grounds, and cites rule 403, there is no argument in the brief addressing the rule 403 arguments made at trial. Thus, this point is either inadequately briefed or fails to conform to the objection made at trial. *See* Tex. R. App. P. 33.1(a)(1), 38.1(i); *Grotti v. State*, 209 S.W.3d 747, 778 (Tex. App.—Fort Worth 2006), *aff'd*, 273 S.W.3d 273 (Tex. Crim. App. 2008); *Heidelberg v. State*, 144 S.W.3d 535, 537 (Tex. Crim. App. 2004). We overrule appellant's third point.

**Confrontation Clause**

Appellant also contends that the admission of the records violated her Sixth Amendment Confrontation Clause rights. But appellant never objected to the admission of the records on that basis at trial. Although she pointed the trial court to the *De la Paz* case from the Eastland Court of Appeals, which

26

addressed a Confrontation Clause complaint, her counsel's comments to the trial court clearly show that her objections were based on the hearsay complaint and analysis in that case.[18] *See De la Paz v. State*, 229 S.W.3d 795, 798–99 (Tex. App.—Eastland 2007), *rev'd*, 273 S.W.3d 671 (Tex. Crim. App. 2008). Thus, she did not preserve error on this issue. *See* Tex. R. App. P. 33.1(a)(1); *Wright v. State*, 28 S.W.3d 526, 536 (Tex. Crim. App. 2000), *cert. denied*, 531 U.S. 1128 (2001); *Courson v. State*, 160 S.W.3d 125, 129 (Tex. App.—Fort Worth 2005, no pet.). We overrule appellant's fifth point.

**Hearsay Complaint**

Appellant's hearsay complaint likewise fails because Irene's unobjected-to identification of appellant as her attacker renders the admission of the records harmless. Appellant's only timely complaint at trial was about the statements contained within the records identifying Irene's "niece" as her attacker; at that time, she specifically asked for redaction of only those parts of the statements. However, because those identifying statements are cumulative of unobjected-to

---

[18] Appellant's counsel argued, "there needs to be a showing that the content of the statement was reasonably relied upon by the care provider as essential to the care." This test was mentioned in the hearsay analysis part of *De la Paz*. 229 S.W.3d 795, 798–99 (Tex. App.—Eastland 2007), *rev'd*, 273 S.W.3d 671 (Tex. Crim. App. 2008). In addition, later, she argued, "I believe part of *De la Paz* . . . is no longer the law . . . . It's a different point of error. . . . That's a separate objection." The Court of Criminal Appeals reversed the part of the Eastland's court's opinion on the Confrontation Clause issue; thus, it seems clear that counsel was distinguishing between a Confrontation Clause complaint and a hearsay complaint, and urging only the hearsay complaint.

27

evidence admitted before the records, there is no reversible error. *See* Tex. R. App. P. 44.2(b); *Leday v. State*, 983 S.W.2d 713, 717 (Tex. Crim. App. 1998) ("It is well established that the improper admission of evidence does not constitute reversible error if the same facts are shown by other evidence which is not challenged." (quoting *Crocker v. State*, 573 S.W.2d 190, 201 (Tex. Crim. App. 1978))). Thus, we overrule appellant's fourth point.

**Limiting Instruction**

Further, appellant did not request a limiting instruction when the medical records were first admitted for all purposes. Thus, she failed to preserve this point for review. *See* Tex. R. App. P. 33.1(a)(1); *Hammock v. State*, 46 S.W.3d 889, 895 (Tex. Crim. App. 2001). Moreover, when the records were first admitted at trial, she made clear that her hearsay objection was directed only to the "who" part of the records—i.e., the statements attributed to Irene that appellant hit her with a baseball bat—rather than the "what" parts, which is what her proposed limiting instruction addressed. Thus, her untimely request for a limiting instruction after the records had been admitted for all purposes did not comport with her timely objections. We overrule her seventh point.

**Admissibility of Paramedic's Testimony**

In her sixth point, appellant contends the trial court abused its discretion by admitting paramedic Garner's testimony that Irene told him appellant had

assaulted her because it is inadmissible hearsay not subject to an exception. The State responds that the evidence is admissible under several hearsay exceptions, including the excited utterance exception.

An "excited utterance" is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tex. R. Evid. 803(2); *Davis v. State*, 268 S.W.3d 683, 703 (Tex. App.—Fort Worth 2008, pet. ref'd). In determining whether a hearsay statement is admissible as an excited utterance, a court may consider the time elapsed and whether the statement was in response to a question. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003); *Salazar v. State*, 38 S.W.3d 141, 154 (Tex. Crim. App.), *cert. denied*, 534 U.S. 855 (2001); *Davis*, 268 S.W.3d at 703. However, it is not dispositive that the statement is an answer to a question or that it was separated by a period of time from the startling event; these are simply factors to consider in determining whether the statement is admissible under the excited utterance hearsay exception. *Zuliani*, 97 S.W.3d at 596; *Davis*, 268 S.W.3d at 703.

The critical determination is "whether the declarant was *still dominated* by the emotions, excitement, fear, or pain of the event" at the time of the statement. *Zuliani*, 97 S.W.3d at 596 (emphasis added); *Davis*, 268 S.W.3d at 703. Stated differently, a reviewing court must determine whether the

29

statement was made "under such circumstances as would reasonably show that it resulted from impulse rather than reason and reflection." *Zuliani*, 97 S.W.3d at 596; *Davis*, 268 S.W.3d at 703.

Although Garner described Irene as conscious and alert, he also said that she was "very scared" and in pain. Her face was covered in blood to the point that Garner could not tell where her nose and mouth were except when she spoke. Her eyes were swollen shut, and she could not see the emergency personnel around her; they had to pry open her eyes. Although—if the events occurred according to Bobby's testimony—Irene would have been lying in her bed around six to seven hours before Garner spoke with her, she testified that she had been knocked unconscious for at least part of that time. Even if she were awake for much of that time, she would have been lying there in pain and in her own blood. Based on these facts, we cannot say that the trial court acted outside the zone of reasonable disagreement by overruling appellant's hearsay objection to Garner's testimony and admitting it as an excited utterance. *See, e.g.*, *Zuliani*, 97 S.W.3d at 596; *Davis*, 268 S.W.3d at 703; *Lagunas v. State*, 187 S.W.3d 503, 513 (Tex. App.—Austin 2005, pet. ref'd).[19] We overrule appellant's sixth point.

---

[19] To the extent appellant's point can be construed as raising a Confrontation Clause complaint, that issue was not preserved at trial. *See Tex*.

**Extraneous Offense of Chasing Jerald With a Knife**

In her eighth point, appellant claims that the trial court erred by failing to give a limiting instruction in the jury charge as to the extraneous offense of appellant's chasing Jerald with a knife. According to appellant, the trial court should have sua sponte instructed the jury on the limited uses of extraneous offenses and that extraneous offenses must be proven beyond a reasonable doubt. However, absent a request by appellant for a limiting instruction either at the time the evidence was admitted or when the charge was being prepared, the trial court was not required to provide such an instruction. *See Delgado v. State*, 235 S.W.3d 244, 254 (Tex. Crim. App. 2007). Accordingly, we overrule appellant's eighth point.

**Conclusion**

Having overruled appellant's eight points, we affirm the trial court's judgment.

TERRIE LIVINGSTON
JUSTICE

PANEL: LIVINGSTON, MCCOY, and MEIER, JJ.

---

R. App. P. 33.1(a)(1); *Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005); *Geuder v. State*, 115 S.W.3d 11, 14–15 (Tex. Crim. App. 2003).

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  October 22, 2009