Christopher David COURSON,
Appellant,

v.

The STATE of Texas, State.

No. 2–04–130–CR.

Court of Appeals of Texas,
Fort Worth.

Feb. 3, 2005.

Richard K. Franklin, Dallas, for Appellant.

Bruce Isaacks, Crim. Dist. Atty., Erin B. Healey, Lori Moraine, Darren Ralstin, Asst. Dist. Attys., Denton, Matthew Paul, State Prosecuting Atty., Austin, for Appellee.

Panel F: LIVINGSTON, DAUPHINOT, and MCCOY, JJ.

## OPINION

BOB MCCOY, Justice.

Appellant Christopher David Courson was convicted of causing injury to a child with a deadly weapon, his hands, and sentenced to ninety-nine years' confinement. On appeal, Appellant challenges the legal and factual sufficiency of the evidence supporting his conviction and the trial court's

denial of his motion for new trial. We will affirm.

## I. FACTUAL BACKGROUND

Appellant brought his six-month-old daughter, Kylie, to Medical Center of Lewisville's emergency room on June 27, 2003 in a comatose state. A hospital volunteer testified that Appellant at first told her that he fell while he was taking a shower with Kylie; later he told her that Kylie fell out of his arms and landed on her side. The emergency room physician who treated Kylie testified that Appellant said he had been carrying Kylie in his arms when she fell out of his arms and landed on the floor. The police officer who first arrived at the hospital testified that Appellant said he had been taking a shower with Kylie, that he slipped and fell as he stepped out of the shower, and that Kylie "squirted up out" of his arms as he fell. After initially being treated at Lewisville, Kylie was later transferred to Children's Medical Center of Dallas ("Children's").

Regarding Kylie's injuries, child neurologist Jay Cook, M.D. testified that Kylie had broken blood vessels in her eyes and indications of cerebral pressure, both of which indicated shaken baby syndrome. Kylie's CT scan showed that she also had subdural hematomas on both sides of the brain. Dr. Cook explained that subdural hematomas can be caused by anything that moves the head forward and backward. Dr. Cook also testified that if a child were injured by falling down and hitting her head, she would exhibit other signs of trauma; in contrast, if a child were injured by shaking, there would be no additional signs other than handprints on the chest. Dr. Cook noted that a chest x-ray showed that Kylie had a rib fracture that was at least two weeks old.

Dr. Cook further testified that Kylie's CT scan showed that her brain had suffered at least two traumatic events; one occurred in the twenty-four-hour period before Kylie was brought to the hospital, and the other had occurred some time before that. Dr. Cook also testified that Kylie suffered two skull fractures and that these had been caused by some external force, such as a fall. However, he explained that Kylie suffered injuries throughout her brain, not in just one location, and that this diffuse brain damage was not the type of injury that would result from a fall.

Travis Kevin Lilly, M.D., the emergency room physician who first treated Kylie, testified that she had suffered at least two incidents of trauma as shown by her retinal hemorrhages, a hallmark of shaken baby syndrome, and skull fractures; however, he could not date the age of the retinal hemorrhages. He noted that Kylie had no bumps or bruises on her head or face to indicate that she had fallen out of Appellant's arms that morning. He also stated that rib fractures do not occur every time a baby is shaken.

Dr. Lilly further testified that the CT scan showed "acute," or new, bleeding in Kylie's brain that had occurred sometime within the previous twenty-four hours. He testified that Kylie also had two "subacute," or old, areas of bleeding called hematomas, one on each side of the front part of her brain; the one on the left was twenty-four to forty-eight hours old, and the one on the right was two to three days old. Dr. Lilly stated that a "significant force" to the head could have caused the old hematomas to bleed again, but he explained that the acute blood appeared towards the back of Kylie's brain, while the old hematomas were in the front of her brain. Nancy McNeil, a pediatric nurse practitioner, also testified that old hematomas can leak new blood, but this new blood would not necessarily show up as a new

hemorrhage on a CT scan. Nurse McNeil further testified that a sudden onset of symptoms such as unresponsiveness would not result from a "rebleed" of an old hematoma; rather, it would be the result of another, acute incident.

Peter Luckett, M.D., the physician in charge of the Children's trauma unit at the time Kylie was admitted, testified that he questioned Kylie's family about her health history in an effort to ascertain the cause of her condition. He reported that the family told him that Kylie had been "completely, entirely normal" before the day she was taken to the emergency room and that there was no reason to believe that there was anything wrong with her. Dr. Luckett testified that because Kylie was brought to the hospital near death but was normal before that, it was an "acute, catastrophic event" that caused her symptoms that day. He also testified that Kylie suffered from shaken baby syndrome and that a baby who had been shaken would not necessarily have any bruises on her chest and back.

Detective Eddie Barrett testified that he spoke with Appellant at the hospital while investigating Kylie's injuries, and Appellant said that he was Kylie's primary caregiver and that Kylie had been with him Wednesday and Thursday, the two days before he brought her to the ER. Appellant testified that he took care of Kylie during the day on Wednesday and Thursday but that he could not remember what he did during those evenings. He admitted that he was in the apartment Thursday evening with Kylie and Morgan, Kylie's mother, but that he "might have left to go to the store or something" for a "[p]ack of cigarettes or something."

Detective Barrett also testified that when he searched Appellant's home after speaking with Appellant at the hospital, he noticed that even though Appellant claimed that the fall happened as he stepped out of the shower, none of the rubber toys sitting on the edge of the shower's bathtub had been knocked over or disturbed. Based on the small size of the bathroom, Detective Barrett also doubted that Appellant, contrary to his story, could have fallen without hitting something such as the toilet seat or counter.

## II. LEGAL AND FACTUAL SUFFICIENCY OF THE EVIDENCE

■ In his brief, Appellant does not dispute that Kylie had shaken baby syndrome. Instead, he argues that because the medical evidence did not pinpoint the exact time that Kylie's injuries occurred, the State did not prove that he was the only person with access to Kylie who could have harmed her. Appellant points to Kylie's old rib fracture and the lack of handprints on her chest as evidence that she was not injured when she was alone with Appellant that morning, and he claims that "[t]here is no evidence that anything happened to Kylie on the 27th of June 2003 other than all the injuries caught up with her and she became symptomatic."

However, the State presented testimony from doctors that Kylie's brain had suffered a traumatic event in the twenty-four-hour period before Appellant brought her to the hospital. There was also testimony that the new blood did not appear in the same area of Kylie's brain as the old hematomas, that Kylie's severe symptoms would not have resulted merely from a "rebleed" of these old hematomas, that Kylie's sudden decline from a normal state to a comatose state showed that she had suffered a new, "catastrophic" trauma, and that a shaking episode would not necessarily cause bruising or broken ribs. Accordingly, the jury could rationally have con-

cluded that Kylie suffered serious bodily injury within the twenty-four-hour time period before Appellant took Kylie to the hospital and not merely that some old injuries became symptomatic, as Appellant argues.

Furthermore, the State was required to prove that Appellant was responsible for causing serious bodily injury to Kylie, not that he had exclusive possession of her for an indeterminate time period before taking her to the emergency room. *See* TEX. PENAL CODE ANN. § 22.04(a)(1) (Vernon 2003). The evidence showed that Appellant was Kylie's primary caregiver, and it further showed that Appellant was with Kylie for at least the twenty-four hour period before he brought her to the hospital. Appellant testified that he may have left Kylie at the apartment with her mother the night before "to go to the store or something" and that he could not remember what he did the night before that, but the jury was free to disbelieve Appellant's testimony. *See Barnes v. State*, 876 S.W.2d 316, 321 (Tex.Crim.App.) ("The jury is the exclusive judge of the credibility of witnesses and of the weight to be given their testimony."), *cert. denied*, 513 U.S. 861, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994). Likewise, the jury was free to reject any implication that some other, unnamed person could have caused Kylie's injuries in light of all the evidence presented at trial. *See Zuniga v. State*, 144 S.W.3d 477, 483 (Tex.Crim.App.2004) (stating that the jury, not the reviewing court, has the responsibility of accepting or rejecting alternative theories of causation); *Johnson v. State*, 871 S.W.2d 183, 186 (Tex.Crim.App.1993) (holding that, in a circumstantial evidence case, "it is not necessary that every fact point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances"), *cert. denied*, 511 U.S. 1046, 114 S.Ct. 1579, 128 L.Ed.2d 222 (1994).

Accordingly, after examining the evidence under the applicable legal [1] and factual [2] sufficiency standards of review, we conclude that the jury was rationally justified in finding appellant's guilt beyond a reasonable doubt. We overrule Appellant's first and second issues.

## III. WITNESS CONFRONTATION

█ In his third issue, Appellant argues that the trial court erred in denying his motion for new trial because admission of hearsay statements made by his wife, Morgan, to police after a domestic dispute between Morgan and Appellant violated his federal constitutional right to confront witnesses against him. *See Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 1374, 158 L.Ed.2d 177 (2004). However, the record does not reflect that Appellant raised any objection at trial to the admission of these statements.

To preserve a complaint for our review, a party must have presented to the trial court a timely and specific objection to the complained-of testimony. *See* TEX.R.APP. P. 33.1(a)(1); *Mosley v. State*, 983 S.W.2d 249, 265 (Tex.Crim.App.1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070, 119 S.Ct. 1466, 143 L.Ed.2d 550 (1999). Appellant claims that because *Crawford v. Washington* was handed down during his trial, the only way to cure the error was through a motion for new trial. We re-

1. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Ross v. State*, 133 S.W.3d 618, 620 (Tex.Crim. App.2004).

2. *See Zuniga v. State*, 144 S.W.3d at 481; *King v. State*, 29 S.W.3d 556, 565 (Tex.Crim. App.2000); *Kutzner v. State*, 994 S.W.2d 180, 184 (Tex.Crim.App.1999).

view the trial court's decision to deny Appellant's motion for new trial under an abuse of discretion standard. *Lewis v. State*, 911 S.W.2d 1, 7 (Tex.Crim.App. 1995); *Jackson v. State*, 139 S.W.3d 7, 13 (Tex.App.-Fort Worth 2004, pet. ref'd).

In *Crawford v. Washington*, the Supreme Court held that testimonial hearsay statements are subject to the requirements of witness unavailability and a prior opportunity for cross-examination contained in the Sixth Amendment's Confrontation Clause, regardless of whether such statements are deemed reliable by the trial court. 541 U.S. 36, 124 S.Ct. at 1374. In so holding, the Court abrogated its earlier decision in *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), as applied to testimonial hearsay statements. *See Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. at 1374. However, *Crawford v. Washington* makes clear that the federal constitutional right to confront one's accusers is neither new nor novel. *See id.; Bunton v. State*, 136 S.W.3d 355, 369 (Tex. App.-Austin 2004, pet. ref'd). Accordingly, Appellant was well aware at the time the State elicited testimony regarding Morgan's hearsay statements of his right to confront witnesses against him as well as the necessity of objecting at trial to the admission of these statements without his having had the opportunity to examine Morgan regarding the statements. *See Wright v. State*, 28 S.W.3d 526, 536 (Tex. Crim.App.2000) (holding that an objection at trial is required to preserve error on Confrontation Clause grounds), *cert. denied*, 531 U.S. 1128, 121 S.Ct. 885, 148 L.Ed.2d 793 (2001).

■ An objection must be made as soon as the basis for the objection becomes apparent. *Lagrone v. State*, 942 S.W.2d 602, 618 (Tex.Crim.App.), *cert. denied*, 522 U.S. 917, 118 S.Ct. 305, 139 L.Ed.2d 235 (1997); *Wilson v. State*, 44 S.W.3d 602, 606

(Tex.App.-Fort Worth 2001, pet. ref'd). The purpose of lodging a timely and specific objection is to inform the trial court of the basis of the objection and to give the court an opportunity to rule on the specific objection as the evidence is introduced. *Aguilar v. State*, 26 S.W.3d 901, 906 (Tex. Crim.App.2000). Accordingly, because Appellant failed to advance his Confrontation Clause objection to the hearsay testimony until after the conclusion of the trial, Appellant's objection was untimely. As a result, Appellant forfeited his complaint that the hearsay testimony violated his federal constitutional right to confront witnesses against him. *See Oveal v. State*, No. 14–02–01089–CR, 2004 WL 2812842, at *1, —— S.W.3d ——, at —— (Tex.App.-Houston [14th Dist.] Dec. 9, 2004, no pet. h.) (holding that appellant failed to preserve his Confrontation Clause complaint under *Crawford v. Washington* by failing to object at trial); *Crawford v. State*, 139 S.W.3d 462, 464 (Tex.App.-Dallas 2004, pet. ref'd) (same); *Bunton*, 136 S.W.3d at 369 (same). Therefore, the trial court did not abuse its discretion in denying Appellant's motion for new trial. We overrule Appellant's third issue.

## IV. CONCLUSION

Having overruled all Appellant's issues on appeal, we affirm the trial court's judgment.