

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-10-00325-CR

CHARLES CALVIN BLACKWELL    APPELLANT

V.

THE STATE OF TEXAS    STATE

----------

## FROM THE 355TH DISTRICT COURT OF HOOD COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellant Charles Calvin Blackwell appeals his convictions for (1) possession of a controlled substance of four or more but less than two hundred grams with the intent to deliver, (2) possession of a controlled substance of more than one but less than four grams with the intent to deliver, and (3) possession of less than one gram of a controlled substance. In five issues, he contends (1) that the evidence was insufficient to corroborate a confidential informant's

---

[1]See Tex. R. App. P. 47.4.

"testimony," (2) that the evidence was insufficient to prove his guilt, (3) that the trial court erred by failing to instruct the jury that a confidential informant's testimony must be corroborated, (4) that evidence was admitted in violation of *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004), and (5) that his trial counsel was ineffective. We affirm.

## Sufficiency of the Evidence

In his second issue, appellant challenges the legal and factual sufficiency of the evidence to prove his convictions.[2] He contends the State could not connect him to the buy upon which his first and second convictions are based and that the two sheriff's investigators involved in the search leading to the third conviction gave conflicting testimony and handled his property unprofessionally. Additionally, according to appellant, the evidence shows that the confidential informant could have framed him.

### Applicable Facts

Roland Smith, an investigator for the Hood County Sheriff's Office, testified that he knew appellant by the name of Charlie. On April 17, 2009, Investigator

---

[2]Appellant challenges both legal and factual sufficiency. But after appellant filed his brief, the court of criminal appeals overruled cases that allowed a factual sufficiency review and held that there is "no meaningful distinction between the . . . legal-sufficiency standard and the . . . factual-sufficiency standard." *Brooks v. State*, 323 S.W.3d 893, 902 (Tex. Crim. App. 2010). Thus, the *Jackson* standard is the "only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt. All other cases to the contrary . . . are overruled." *Id*. at 912. Accordingly, we apply the *Jackson* standard of review to appellant's sufficiency issues.

Smith met with a confidential informant and wired him with a communication device that transmitted audio and video. According to Investigator Smith, the confidential informant contacted appellant to arrange to buy drugs from him. Before the confidential informant went to meet appellant, Investigator Smith searched him and his car to make sure there were no illegal narcotics with him. He gave the informant money to buy the drugs; officers had photocopied the money. Investigator Smith also followed the informant to where he was meeting appellant.

Investigator Smith identified State's Exhibit 1 as a digital reproduction of the recording of the transaction between the confidential informant and appellant; the trial court admitted the recording. Investigator Smith testified that he observed the buy, which took place in the informant's car, from a clandestine location, but he saw "what was taking place at the time it was taking place." He saw appellant hand something to the informant. The State played the recording for the jury.

The informant is first shown on the tape talking to the investigator and another person about the planned buy. The investigator gives the informant $400 and tells him to use it all for ice if he has to. Although the informant's face cannot be seen, his cell phone can be seen as if he is holding it in front of him. On the audio, the informant can be heard making a phone call to Charlie. The person on the other end of the line says he has some coke. The two also

3

discuss the purchase of methamphetamine; the man on the phone says he can get more ice.

Once the informant arrives at the meeting place, the recording does not show the face of the person the informant is meeting; the informant stays in the driver's side of his vehicle with the window rolled down. He talks with the man through the open window on the driver's side and the two discuss money. The informant says he is giving the man all $400; $90 for some cocaine and methamphetamine, and $300 for more methamphetamine to be delivered later. The informant tells the man to pay him back his $10 change for the cocaine and initial methamphetamine that the man already has. The informant can be seen handing money out the driver's side window. After the informant drives away, he can be heard calling Charlie and telling him to apply the extra $10 toward the methamphetamine that is to be delivered later.[3]

Investigator Smith identified appellant as the man from whom the informant bought the drugs. Investigator Smith testified that after the buy, the informant brought packages of methamphetamine and cocaine back and explained that he gave Charlie the rest of the money for more ice. Investigator Smith testified that upon obtaining the drugs,

> We take them back to the sheriff's office, and we go into our evidence room where we weigh them, we them [sic] in a bag, seal it,

---

[3]There is no evidence regarding what, if anything, happened to this future delivery of methamphetamine.

put an evidence tag on it, and then we put it in a locker and for the evidence clerk to pick up at a later date.

. . . .

. . . The tag's got the case number, the date, the charge, and then my name on it, my - - your signature will go on the . . . tag, it goes on the evidence.

According to Smith, that same procedure was used in this case. Police logged four bags of drugs, three of which were methamphetamine and one of which was cocaine. The State admitted exhibit 31, which was the form used to submit the drugs to the lab for testing.

After watching the recording, Investigator Smith prepared an arrest warrant for appellant. Investigator Smith waited to serve the warrant, however, until appellant had re-upped his supply of drugs.[4] The sheriff's office had received information that appellant would be transporting more drugs on May 14, 2009; they pulled appellant over in a traffic stop that day in Hood County. The stop was recorded by a device in Investigator Smith's vehicle; the recording of the stop was admitted as State's Exhibit 2. According to Investigator Smith, appellant seemed "wired up" when he pulled him over.

Appellant asked the officers to allow his brother to pick up his truck, but officers ran a K-9 sniff on the truck, and the dog alerted to the presence of

---

[4]According to Smith, "re-upping" means "they gather their money from their . . . sales, and then they go to their dealer and they buy another quantity so they can come back . . . with their product and start selling again."

5

narcotics.  Under the hood of the truck, officers found a meth pipe in a sock.[5] Rolled inside the tube of the receiver hitch, officers found a plastic baggie of what they believed to be marijuana.  They also found nine bags of a substance that field-tested positive as methamphetamine.  They logged everything they found into evidence according to the procedure Investigator Smith testified to previously.  The recording of the stop was played for the jury.

Investigator Smith testified that the total amount of methamphetamine in the nine bags seized from the truck was 11.2 grams, based on the report that he had signed and that the sheriff's office had submitted to the DPS lab when it sent the samples to be tested.  The marijuana was 13.6 grams.  Investigators Smith and Clark also seized $492.33 in cash from the truck.[6]

After seizing the narcotics from the truck, the investigators took them back to the sheriff's office and logged them into evidence.  Investigator Smith testified that all narcotics are individually packaged in a "seal-a-meal type thing" and then put in a larger, heavier bag, which is then sealed.  An evidence tag is put on the bag with the case number, the offense, and the investigator's signature.  Also, the investigator fills out an evidence submittal form, keeps a copy for the report, and the original goes with the evidence for the evidence clerk to use when later

_____

[5]Officers attempted to fingerprint the pipe but did not find any prints.

[6]They put the cash in an evidence bag and turned it over to the district attorney.  The trial court admitted the receipt from the D.A. into evidence. Officers never found any of the bills that the confidential informant had used to purchase drugs.

sending the bags to DPS for testing. The evidence is put in a locker and the number of the locker is recorded on the evidence form. Here, the bags were sent to DPS for testing; they were placed in a larger bag but not opened until the lab opened them for testing.

Regarding appellant's possible intent to deliver the drugs found in the truck on May 14, 2009, Investigator Smith testified that such evidence was from the separate packaging, i.e., the meth was "broken down into little packages for sale." He agreed the small packages were in relatively uniform amounts. They also took into consideration the cash on appellant when they found him. During the stop, Investigator Clark answered appellant's cell phone when it rang and pretended to be appellant. The sheriff's office also took Investigator Clark's conversation into account in deciding whether to charge appellant with intent to deliver.

On cross-examination, defense counsel asked Investigator Smith who the confidential informant was, and Investigator Smith identified him as Michael Eubanks. Investigator Smith had arrested Eubanks in a prior case; Eubanks was "working off" that charge by buying drugs from appellant.[7] According to Investigator Smith, Eubanks brought him back the drugs that he had bought from appellant, but he did not bring back any of the money. When asked whether

---

[7]Investigator Smith explained that Eubanks was a small-time dealer who purchased his drugs from appellant, so the sheriff's office allowed Eubanks to work off his drug charges by cooperating in an investigation of appellant.

Eubanks bought $90 worth of drugs and only brought back the drugs, Investigator Smith said, "Okay" and then, "That's correct." One of the bags of drugs had a tear in the seam. On the tape of the buy, Eubanks tells Investigator Smith about the tear and says appellant had told him about it during the buy. The tipster who told Investigator Smith that appellant was re-upping on May 14, 2009 was also Eubanks. When officers pulled appellant over on May 14, 2009, he had a passenger named Bobby Underhill in the truck with him. Investigator Smith admitted he did not hear Investigator Clark's conversation with whomever had called appellant's cell phone.

On redirect, the prosecutor asked, "Now, do normal persons who carry cell phones get calls on the phone asking for $20 bags of methamphetamine?" Appellant's counsel objected, stating that Investigator Smith had already admitted that he had no knowledge of the conversation. The trial court overruled the objection, and Investigator Smith answered, "Normally, they don't."

William Todsen, a forensic scientist with the Department of Public Safety Crime Laboratory in Abilene, testified that he analyzed the evidence from both the buy and the stop. He identified the bags that he had analyzed, testifying that he unsealed them for purposes of testing and that he resealed them when he was finished. They did not appear to have been tampered with since that time. The bags were sealed when he got them. As for the drugs from the buy, the methamphetamine weighed a total of 2.13 grams, and the cocaine weighed less than one gram.

The methamphetamine seized from the truck weighed 6.01 grams, and the marijuana weighed .42 ounces. Although Todsen did not testify to the weights of the methamphetamine in each individual bag, he testified that they were the same as in the lab report he had prepared, which the trial court admitted into evidence. Todsen testified that he weighed the bags separately, then took out whatever substance was inside and weighed just the bag; that way, he could determine the net weight of the substance itself.

William Watt, a sergeant with the Hood County's Sheriff's Department, testified that Investigators Smith and Clark called him to transport appellant to jail after arresting him on May 14. Through Sergeant Watt, the State introduced a DVD recording of the arrest on May 14.

Investigator Clark testified that he was the handler for Laws, the canine who alerted on appellant's truck. According to Investigator Clark, Laws alerted to the passenger side of the truck. Investigator Clark agreed that they seized $492.33 from appellant. He said he checked the truck's toolbox, but all he found was an X-Box that Underhill said belonged to him. He and Investigator Smith photographed the items they found in the truck. After they were finished, they took the evidence to the sheriff's office where Investigator Smith placed it into evidence, and Investigator Clark interviewed appellant and gave him his *Miranda* warnings. The interview was recorded and published to the jury. Investigator Clark also testified that he thought appellant was under the influence of methamphetamine at the time of the stop.

9

Investigator Clark testified without objection that the phone call he took on appellant's cell phone was from Tom who said he needed "a 20," which Investigator Clark understood to mean $20 of methamphetamine. He asked where Tom was, and the man said his aunt's house on Brierwood. Investigator Clark said he would be there shortly and hung up, but he never went to the street Tom gave him because he was interviewing appellant. When Investigator Clark interviewed appellant, he asked if he knew someone named "Tom," and appellant answered, "You mean Tom over on Brierwood?" Appellant tried to tell Investigator Clark that he had just bought the truck that day, but Investigator Clark had pulled appellant over in the same truck "probably a couple of weeks before."

On cross-examination, appellant's counsel asked if Investigator Clark knew what number Tom had been trying to call or whether he had tried to call Tom back to verify whom he had been trying to call. He asked what exactly Tom had said; Investigator Clark answered that he could not recall specifically but that "he had called and asked for Charlie, for Mr. Blackwell, and stated he wanted a $20 bag of methamphetamine." Investigator Clark denied that Tom had spoken in "code" or that people who called asking for drugs commonly asked for them in code. When asked if he stated the conversation differently in his report from May 14, 2009, Investigator Clark said,

> That's what I put in my report, is what was said. Okay? I said I didn't remember obviously every detail, you know, that - - that - - of the conversation, but the basic terminology that was used to

10

obviously to show that Mr. Blackwell was selling drugs was what was put in the report.

Upon questioning by defense counsel, Investigator Clark admitted that proof that appellant was selling drugs was important to both him and Investigator Smith. In his closing argument, appellant's counsel urged the jury to find that appellant had been framed by Eubanks, who manipulated the buy and later put the drugs in appellant's truck. He also argued that Eubanks had borrowed Tom's phone and called, pretending to be Tom so that he could set up appellant. Investigator Clark testified that he did not know Eubanks before the buy.

**Analysis**

Appellant contends the evidence is insufficient because there is a lack of physical evidence linking appellant to the drugs, there are inconsistencies in Investigator Smith's and Investigator Clark's testimony, Investigators Smith and Clark mishandled the evidence by giving appellant's X-Box to Underhill when they pulled him over on May 14, 2009, and the evidence shows Eubanks could have framed him.

With regard to the buy, the jury could have compared the voice of "Charlie" on the videotaped recording to appellant's voice in the other recordings introduced into evidence and concluded that appellant was, indeed, the person from whom Eubanks bought cocaine and methamphetamine on April 17, 2009. Although appellant makes much of the fact that Eubanks bought only $90 worth of drugs that day and did not bring back the remaining $310, Eubanks makes it

11

clear on the recording that he gave the remaining $310 to appellant for more methamphetamine. That the jury was not told what happened to the rest of that methamphetamine does not bear upon its decision that appellant actually sold Eubanks 2.13 grams of methamphetamine and less than one gram of cocaine that day.

Appellant contends that Investigator Smith's testimony was not credible because there is a discrepancy in the weight of the drugs as reported to the lab by Investigator Smith and the weight reported by the lab. But Investigator Smith did not testify as to the method he used to weigh the drugs; Todsen, the DPS forensic scientist, testified that he determined the net weight of the substances independent of the bags they were contained in. The jury could have believed that the discrepancy was due to differences in the way the substances were weighed by Investigator Smith and Todsen. Moreover, the weights used for purposes of charging appellant were the lesser weights determined by Todsen.

Appellant also contends Investigator Clark's testimony was inconsistent because he initially said Laws had never alerted to a "false positive" but later changed his testimony and said he had; additionally, according to appellant, Investigator Clark initially said he had never seen appellant until the May 14, 2009 traffic stop but then later said he had stopped him a couple of weeks before the May 14, 2009 traffic stop. Investigator Clark testified on direct that there was nothing he could do to make Laws alert to a false positive and agreed Laws would only alert if "he detects that odor." On cross-examination, Investigator

Clark answered yes when asked whether Laws had ever alerted on a vehicle where no drugs were found. However, he said that Laws had never alerted on a vehicle where no drugs had been at some point in the past. If Laws alerted and no drugs were found, it was because the person using the vehicle had admitted using drugs in the past in the vehicle. Contrary to appellant's argument, Investigator Clark did not contradict himself. Investigator Clark testified that he had seen appellant driving the truck on other occasions. He later testified that he had stopped appellant once before the May 14, 2009 stop. Thus, he did not testify that May 14, 2009 was the first time he saw appellant driving the truck.[8]

Appellant also contends that the evidence is insufficient because Investigator Clark testified that appellant had care, custody, and control of the truck on May 14, 2009, yet Investigator Clark testified that he nevertheless gave

---

[8]The exchange was as follows:

Q  Okay. Now, one thing - - you said that you had stopped him before, is that right?

A  Yes, sir. I don't remember exactly the date, but I had stopped - - stopped him one time before.

Q  Was he in that same vehicle when you stopped him before?

A  Yes, sir, that's correct.

Q  Okay. Had you ever seen him driving any other vehicles besides that vehicle?

A  No, sir. Because that's - - that was first time I had dealt with him on the *first stop*. [Emphasis added.]

13

the X-Box found in the truck's toolbox to the passenger, Underhill, rather than appellant. According to Investigator Clark, Underhill said the X-Box belonged to him, and because the officers had Underhill's "information," they gave the X-Box to him. They did not ask appellant first if the X-Box belonged to him; Investigator Clark thought appellant may have already been taken to jail by that time. Nevertheless, there is evidence that the drugs in the truck belonged to appellant; Investigator Clark testified that he had stopped appellant in the truck before and that he had seen appellant driving the truck before, and appellant tried to deceive the investigators by telling them he had just bought the truck that day. *See Christensen v. State*, 240 S.W.3d 25, 35 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (holding that deception after an alleged crime is one circumstance that may permit an inference of guilt when combined with other evidence). Moreover, both officers thought appellant was high on methamphetamine that day, and on the recordings of the stop and interview, appellant appears to be agitated and does not stop moving. We must presume that the factfinder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Jackson v. Virginia*, 443 U.S. 307, 326, 99 S. Ct. 2781, 2793 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We conclude and hold that despite the minor discrepancies in the evidence alleged by appellant, the evidence is nevertheless sufficient to prove each of the offenses beyond a reasonable doubt.

We overrule appellant's second issue.

14

## No Corroboration Required Under Article 38.141

In his first issue, appellant complains that the confidential informant's "testimony" was insufficiently corroborated. Article 38.141(a) of the code of criminal procedure provides,

> A defendant may not be convicted of an offense under Chapter 481, Health and Safety Code, on the testimony of a person who is not a licensed peace officer or a special investigator but who is acting covertly on behalf of a law enforcement agency or under the color of law enforcement unless the testimony is corroborated by other evidence tending to connect the defendant with the offense committed.

Tex. Code Crim. Proc. Ann. art. 38.141(a) (West 2005). The plain language of the statute provides that a licensed peace officer's testimony does not need to be corroborated. *Payan v. State*, 199 S.W.3d 380, 383 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd), *cert. denied*, 549 U.S. 1170 (2007). Here, Eubanks did not testify; only Investigators Smith and Clark testified. Accordingly, article 38.141 does not apply, and no additional corroboration was required. *See id*. We overrule appellant's first issue. In addition, because article 38.141 was not applicable, the trial court was not required to give the jury an instruction regarding corroboration; we therefore overrule appellant's third issue as well.

## *Crawford* Error Not Preserved

In his fourth issue, appellant contends that the trial court allowed evidence in violation of *Crawford*; however, appellant did not object to the evidence on *Crawford* or Confrontation Clause grounds. Accordingly, we conclude and hold that he failed to preserve error; we overrule his fourth issue. *See* Tex. R. App. P.

15

33.1(a)(1); *Courson v. State*, 160 S.W.3d 125, 129 (Tex. App.—Fort Worth 2005, no pet.).

### Counsel Not Ineffective

In his fifth issue, appellant contends that his counsel was ineffective for failing to file pretrial motions related to the confidential informant's involvement in the case, failing to object to hearsay, including the "testimony" of the confidential informant, eliciting damaging hearsay, and failing to effectively cross-examine witnesses.

### Standard of Review

To establish ineffective assistance of counsel, appellant must show by a preponderance of the evidence that his counsel's representation fell below the standard of prevailing professional norms and that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005); *Mallett v. State*, 65 S.W.3d 59, 62–63 (Tex. Crim. App. 2001); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999).

In evaluating the effectiveness of counsel under the first prong, we look to the totality of the representation and the particular circumstances of each case. *Thompson*, 9 S.W.3d at 813. The issue is whether counsel's assistance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error. *See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065.

Review of counsel's representation is highly deferential, and the reviewing court indulges a strong presumption that counsel's conduct fell within a wide range of reasonable representation. *Salinas*, 163 S.W.3d at 740; *Mallett*, 65 S.W.3d at 63. A reviewing court will rarely be in a position on direct appeal to fairly evaluate the merits of an ineffective assistance claim. *Salinas*, 163 S.W.3d at 740; *Thompson*, 9 S.W.3d at 813–14. "In the majority of cases, the record on direct appeal is undeveloped and cannot adequately reflect the motives behind trial counsel's actions." *Salinas*, 163 S.W.3d at 740 (quoting *Mallett*, 65 S.W.3d at 63). To overcome the presumption of reasonable professional assistance, "any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Id.* (quoting *Thompson*, 9 S.W.3d at 813). It is not appropriate for an appellate court to simply infer ineffective assistance based upon unclear portions of the record. *Mata v. State*, 226 S.W.3d 425, 432 (Tex. Crim. App. 2007).

The second prong of *Strickland* requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial, i.e., a trial with a reliable result. *Strickland,* 466 U.S. at 687, 104 S. Ct. at 2064. In other words, appellant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694, 104 S. Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* The ultimate focus of our inquiry must

be on the fundamental fairness of the proceeding in which the result is being challenged. *Id.* at 697, 104 S. Ct. at 2070.

**Analysis**

Appellant does not specifically state which, if any, pretrial motions would have changed the outcome of these cases. Trial counsel's failure to file pretrial motions generally does not result in ineffective assistance of counsel. *Hill v. State*, 303 S.W.3d 863, 879 (Tex. App.—Fort Worth 2009, pet. ref'd). Appellant's complaint is that trial counsel failed to appreciate the hearsay issue regarding the confidential informant. However, as we have explained, Eubanks did not testify, and counsel may have had a reasonable strategy for not objecting at trial to Investigator Smith's testimony that Eubanks called him and said appellant had re-upped, giving officers the information they wanted to pull appellant over the second time. Specifically, trial counsel argued in his closing that Eubanks framed appellant. *See Lopez v. State*, PD-0481-10, 2011 WL 2408942, at *3 (Tex. Crim. App. June 15, 2011) (reiterating that when appellate court is faced with silent record regarding trial counsel's reasons for his or her actions or omissions at trial, court must assume "that counsel had a strategy if any reasonably sound strategic motivation can be imagined").

Moreover, although appellant complains that his counsel failed to object to evidence regarding the phone call from Tom, and additionally elicited "damaging"

18

hearsay about what "Tom" said on the phone,[9] counsel apparently employed that call as part of his strategy of claiming that Eubanks framed appellant. In his closing, counsel suggested that Eubanks had called on appellant's cell phone, pretending to be Tom. Also, in questioning Investigator Clark about what exactly Tom had said, counsel showed that Investigator Clark's memory of the call was not very detailed and that no follow-up investigation was done to determine that a man named Tom on Brierwood was indeed the person whom Investigator Clark had talked with.

According to appellant, his trial counsel also did a poor job of cross-examining Todsen and asked only two questions of Sergeant Watt. Although trial counsel's cross-examination of Todsen was brief, trial counsel asked Todsen whether he had investigated if the drugs he had weighed belonged to appellant. Todsen said no and that he had just tested them to see what was in them. This cross-examination fits in with a defense strategy of claiming the drugs did not belong to appellant and were planted by Eubanks; the weight of the drugs or the lab's methodology would not be important.

Sergeant Watt's testimony on direct was only seven pages in the record. He testified that he was called to pick up appellant and transport him to the jail; he did not see any additional drugs other than what the investigators had already

---

[9]Appellant also complains that trial counsel failed to object to Investigator Smith's "hearsay" testimony about the weight of the drugs, but Investigator Smith testified to the results he determined based on *his own* weighing of the drugs *before* sending them to the DPS lab.

19

found.  Sergeant Watt also testified that appellant had asked if the truck could be released to his brother.  Although trial counsel's cross-examination of Sergeant Watt was brief, it was also not inconsistent with his apparent strategy, nor was Sergeant Watt a crucial witness for the State.

The right to effective assistance does not guarantee errorless counsel but rather objectively reasonable representation.  *Id*. at *3.  We will not second-guess trial counsel's apparent strategy of arguing that the evidence as admitted was equally consistent with appellant's being framed by Eubanks, especially with a record that is silent on counsel's reasons.  *See id*. at *3–4.

We overrule appellant's fifth issue.

## Conclusion

Having overruled appellant's five issues, we affirm the trial court's judgments.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; MCCOY and GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: July 21, 2011