02-10-325-CR









 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-10-00325-CR

 

 


 
 
 Charles Calvin Blackwell
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 STATE
 
 


 

 

----------

 

FROM THE 355th
District Court OF Hood COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

 

Appellant Charles Calvin
Blackwell appeals his convictions for (1) possession of a controlled substance
of four or more but less than two hundred grams with the intent to deliver, (2)
possession of a controlled substance of more than one but less than four grams
with the intent to deliver, and (3) possession of less than one gram of a controlled
substance.  In five issues, he contends (1) that the evidence was insufficient
to corroborate a confidential informant’s “testimony,” (2) that the evidence
was insufficient to prove his guilt, (3) that the trial court erred by failing
to instruct the jury that a confidential informant’s testimony must be
corroborated, (4) that evidence was admitted in violation of Crawford v.
Washington, 541 U.S. 36, 124 S. Ct. 1354 (2004), and (5) that his trial
counsel was ineffective.  We affirm.

Sufficiency of the Evidence

In his second issue,
appellant challenges the legal and factual sufficiency of the evidence to prove
his convictions.[2]  He contends the State
could not connect him to the buy upon which his first and second convictions
are based and that the two sheriff’s investigators involved in the search
leading to the third conviction gave conflicting testimony and handled his
property unprofessionally.  Additionally, according to appellant, the evidence
shows that the confidential informant could have framed him.

Applicable Facts

Roland Smith, an investigator
for the Hood County Sheriff’s Office, testified that he knew appellant by the
name of Charlie.  On April 17, 2009, Investigator Smith met with a confidential
informant and wired him with a communication device that transmitted audio and
video.  According to Investigator Smith, the confidential informant contacted
appellant to arrange to buy drugs from him.  Before the confidential informant
went to meet appellant, Investigator Smith searched him and his car to make
sure there were no illegal narcotics with him.  He gave the informant money to
buy the drugs; officers had photocopied the money.  Investigator Smith also
followed the informant to where he was meeting appellant.

Investigator Smith identified
State’s Exhibit 1 as a digital reproduction of the recording of the transaction
between the confidential informant and appellant; the trial court admitted the
recording.  Investigator Smith testified that he observed the buy, which took
place in the informant’s car, from a clandestine location, but he saw “what was
taking place at the time it was taking place.”  He saw appellant hand something
to the informant.  The State played the recording for the jury.

The informant is first shown
on the tape talking to the investigator and another person about the planned
buy.  The investigator gives the informant $400 and tells him to use it all for
ice if he has to.  Although the informant’s face cannot be seen, his cell phone
can be seen as if he is holding it in front of him.  On the audio, the
informant can be heard making a phone call to Charlie.  The person on the other
end of the line says he has some coke.  The two also discuss the purchase of
methamphetamine; the man on the phone says he can get more ice.

Once the informant arrives at
the meeting place, the recording does not show the face of the person the
informant is meeting; the informant stays in the driver’s side of his vehicle
with the window rolled down.  He talks with the man through the open window on
the driver’s side and the two discuss money.  The informant says he is giving
the man all $400; $90 for some cocaine and methamphetamine, and $300 for more
methamphetamine to be delivered later.  The informant tells the man to pay him
back his $10 change for the cocaine and initial methamphetamine that the man
already has.  The informant can be seen handing money out the driver’s side
window.  After the informant drives away, he can be heard calling Charlie and
telling him to apply the extra $10 toward the methamphetamine that is to be
delivered later.[3]

Investigator Smith identified
appellant as the man from whom the informant bought the drugs.  Investigator
Smith testified that after the buy, the informant brought packages of methamphetamine
and cocaine back and explained that he gave Charlie the rest of the money for
more ice.  Investigator Smith testified that upon obtaining the drugs,

We take them back to the sheriff’s office, and we go into
our evidence room where we weigh them, we them [sic] in a bag, seal it, put an
evidence tag on it, and then we put it in a locker and for the evidence clerk
to pick up at a later date.

 

. . . . 

 

. . .  The tag’s got the case number, the date, the charge,
and then my name on it, my - - your signature will go on the . . . tag, it goes
on the evidence.

 

According to Smith, that same
procedure was used in this case.  Police logged four bags of drugs, three of
which were methamphetamine and one of which was cocaine.  The State admitted
exhibit 31, which was the form used to submit the drugs to the lab for testing.

After watching the recording,
Investigator Smith prepared an arrest warrant for appellant.  Investigator
Smith waited to serve the warrant, however, until appellant had re-upped his
supply of drugs.[4]  The sheriff’s office had
received information that appellant would be transporting more drugs on May 14,
2009; they pulled appellant over in a traffic stop that day in Hood County.  The
stop was recorded by a device in Investigator Smith’s vehicle; the recording of
the stop was admitted as State’s Exhibit 2.  According to Investigator Smith,
appellant seemed “wired up” when he pulled him over.

Appellant asked the officers
to allow his brother to pick up his truck, but officers ran a K-9 sniff on the
truck, and the dog alerted to the presence of narcotics.  Under the hood of the
truck, officers found a meth pipe in a sock.[5]  Rolled inside the tube
of the receiver hitch, officers found a plastic baggie of what they believed to
be marijuana.  They also found nine bags of a substance that field-tested
positive as methamphetamine.  They logged everything they found into evidence
according to the procedure Investigator Smith testified to previously.  The
recording of the stop was played for the jury.

Investigator Smith testified
that the total amount of methamphetamine in the nine bags seized from the truck
was 11.2 grams, based on the report that he had signed and that the sheriff’s
office had submitted to the DPS lab when it sent the samples to be tested.  The
marijuana was 13.6 grams.  Investigators Smith and Clark also seized $492.33 in
cash from the truck.[6] 

After seizing the narcotics
from the truck, the investigators took them back to the sheriff’s office and
logged them into evidence.  Investigator Smith testified that all narcotics are
individually packaged in a “seal-a-meal type thing” and then put in a larger,
heavier bag, which is then sealed.  An evidence tag is put on the bag with the case
number, the offense, and the investigator’s signature.  Also, the investigator
fills out an evidence submittal form, keeps a copy for the report, and the original
goes with the evidence for the evidence clerk to use when later sending the
bags to DPS for testing.  The evidence is put in a locker and the number of the
locker is recorded on the evidence form.  Here, the bags were sent to DPS for
testing; they were placed in a larger bag but not opened until the lab opened
them for testing.

Regarding appellant’s
possible intent to deliver the drugs found in the truck on May 14, 2009,
Investigator Smith testified that such evidence was from the separate
packaging, i.e., the meth was “broken down into little packages for sale.”  He
agreed the small packages were in relatively uniform amounts.  They also took
into consideration the cash on appellant when they found him.  During the stop,
Investigator Clark answered appellant’s cell phone when it rang and pretended
to be appellant.  The sheriff’s office also took Investigator Clark’s
conversation into account in deciding whether to charge appellant with intent
to deliver.

On cross-examination, defense
counsel asked Investigator Smith who the confidential informant was, and Investigator
Smith identified him as Michael Eubanks.  Investigator Smith had arrested
Eubanks in a prior case; Eubanks was “working off” that charge by buying drugs
from appellant.[7]  According to
Investigator Smith, Eubanks brought him back the drugs that he had bought from
appellant, but he did not bring back any of the money.  When asked whether
Eubanks bought $90 worth of drugs and only brought back the drugs, Investigator
Smith said, “Okay” and then, “That’s correct.”  One of the bags of drugs had a
tear in the seam.  On the tape of the buy, Eubanks tells Investigator Smith
about the tear and says appellant had told him about it during the buy.  The
tipster who told Investigator Smith that appellant was re-upping on May 14,
2009 was also Eubanks.  When officers pulled appellant over on May 14, 2009, he
had a passenger named Bobby Underhill in the truck with him.  Investigator
Smith admitted he did not hear Investigator Clark’s conversation with whomever had
called appellant’s cell phone.

On redirect, the prosecutor
asked, “Now, do normal persons who carry cell phones get calls on the phone
asking for $20 bags of methamphetamine?”  Appellant’s counsel objected, stating
that Investigator Smith had already admitted that he had no knowledge of the
conversation.  The trial court overruled the objection, and Investigator Smith
answered, “Normally, they don’t.”

William Todsen, a forensic
scientist with the Department of Public Safety Crime Laboratory in Abilene,
testified that he analyzed the evidence from both the buy and the stop.  He
identified the bags that he had analyzed, testifying that he unsealed them for
purposes of testing and that he resealed them when he was finished.  They did
not appear to have been tampered with since that time.  The bags were sealed
when he got them.  As for the drugs from the buy, the methamphetamine weighed a
total of 2.13 grams, and the cocaine weighed less than one gram.

The methamphetamine seized
from the truck weighed 6.01 grams, and the marijuana weighed .42 ounces.  Although
Todsen did not testify to the weights of the methamphetamine in each individual
bag, he testified that they were the same as in the lab report he had prepared,
which the trial court admitted into evidence.  Todsen testified that he weighed
the bags separately, then took out whatever substance was inside and weighed
just the bag; that way, he could determine the net weight of the substance
itself.

William Watt, a sergeant with
the Hood County’s Sheriff’s Department, testified that Investigators Smith and
Clark called him to transport appellant to jail after arresting him on May 14. 
Through Sergeant Watt, the State introduced a DVD recording of the arrest on
May 14.

Investigator Clark testified
that he was the handler for Laws, the canine who alerted on appellant’s truck. 
According to Investigator Clark, Laws alerted to the passenger side of the
truck.  Investigator Clark agreed that they seized $492.33 from appellant.  He
said he checked the truck’s toolbox, but all he found was an X-Box that
Underhill said belonged to him.  He and Investigator Smith photographed the
items they found in the truck.  After they were finished, they took the
evidence to the sheriff’s office where Investigator Smith placed it into
evidence, and Investigator Clark interviewed appellant and gave him his Miranda
warnings.  The interview was recorded and published to the jury.  Investigator
Clark also testified that he thought appellant was under the influence of
methamphetamine at the time of the stop.

Investigator Clark testified
without objection that the phone call he took on appellant’s cell phone was
from Tom who said he needed “a 20,” which Investigator Clark understood to mean
$20 of methamphetamine.  He asked where Tom was, and the man said his aunt’s
house on Brierwood.  Investigator Clark said he would be there shortly and hung
up, but he never went to the street Tom gave him because he was interviewing
appellant.  When Investigator Clark interviewed appellant, he asked if he knew
someone named “Tom,” and appellant answered, “You mean Tom over on Brierwood?” 
Appellant tried to tell Investigator Clark that he had just bought the truck
that day, but Investigator Clark had pulled appellant over in the same truck
“probably a couple of weeks before.”

On cross-examination,
appellant’s counsel asked if Investigator Clark knew what number Tom had been
trying to call or whether he had tried to call Tom back to verify whom he had
been trying to call.  He asked what exactly Tom had said; Investigator Clark
answered that he could not recall specifically but that “he had called and
asked for Charlie, for Mr. Blackwell, and stated he wanted a $20 bag of
methamphetamine.”  Investigator Clark denied that Tom had spoken in “code” or
that people who called asking for drugs commonly asked for them in code.  When
asked if he stated the conversation differently in his report from May 14,
2009, Investigator Clark said,

That’s what I put in my report, is what
was said.  Okay?  I said I didn’t remember obviously every detail, you know,
that - - that - - of the conversation, but the basic terminology that was used
to obviously to show that Mr. Blackwell was selling drugs was what was put in
the report.

Upon questioning by defense
counsel, Investigator Clark admitted that proof that appellant was selling
drugs was important to both him and Investigator Smith.  In his closing
argument, appellant’s counsel urged the jury to find that appellant had been
framed by Eubanks, who manipulated the buy and later put the drugs in
appellant’s truck.  He also argued that Eubanks had borrowed Tom’s phone and
called, pretending to be Tom so that he could set up appellant.  Investigator
Clark testified that he did not know Eubanks before the buy.

Analysis

Appellant contends the
evidence is insufficient because there is a lack of physical evidence linking
appellant to the drugs, there are inconsistencies in Investigator Smith’s and
Investigator Clark’s testimony, Investigators Smith and Clark mishandled the
evidence by giving appellant’s X-Box to Underhill when they pulled him over on
May 14, 2009, and the evidence shows Eubanks could have framed him.

With regard to the buy, the
jury could have compared the voice of “Charlie” on the videotaped recording to
appellant’s voice in the other recordings introduced into evidence and
concluded that appellant was, indeed, the person from whom Eubanks bought
cocaine and methamphetamine on April 17, 2009.  Although appellant makes much
of the fact that Eubanks bought only $90 worth of drugs that day and did not
bring back the remaining $310, Eubanks makes it clear on the recording that he
gave the remaining $310 to appellant for more methamphetamine.  That the jury
was not told what happened to the rest of that methamphetamine does not bear
upon its decision that appellant actually sold Eubanks 2.13 grams of
methamphetamine and less than one gram of cocaine that day.

Appellant contends that
Investigator Smith’s testimony was not credible because there is a discrepancy
in the weight of the drugs as reported to the lab by Investigator Smith and the
weight reported by the lab.  But Investigator Smith did not testify as to the
method he used to weigh the drugs; Todsen, the DPS forensic scientist,
testified that he determined the net weight of the substances independent of
the bags they were contained in.  The jury could have believed that the
discrepancy was due to differences in the way the substances were weighed by
Investigator Smith and Todsen.  Moreover, the weights used for purposes of
charging appellant were the lesser weights determined by Todsen.

Appellant also contends Investigator
Clark’s testimony was inconsistent because he initially said Laws had never
alerted to a “false positive” but later changed his testimony and said he had;
additionally, according to appellant, Investigator Clark initially said he had
never seen appellant until the May 14, 2009 traffic stop but then later said he
had stopped him a couple of weeks before the May 14, 2009 traffic stop.  Investigator
Clark testified on direct that there was nothing he could do to make Laws alert
to a false positive and agreed Laws would only alert if “he detects that
odor.”  On cross-examination, Investigator Clark answered yes when asked
whether Laws had ever alerted on a vehicle where no drugs were found.  However,
he said that Laws had never alerted on a vehicle where no drugs had been at
some point in the past.  If Laws alerted and no drugs were found, it was
because the person using the vehicle had admitted using drugs in the past in
the vehicle.  Contrary to appellant’s argument, Investigator Clark did not
contradict himself.  Investigator Clark testified that he had seen appellant
driving the truck on other occasions. He later testified that he had stopped
appellant once before the May 14, 2009 stop.  Thus, he did not testify that May
14, 2009 was the first time he saw appellant driving the truck.[8]

Appellant also contends that
the evidence is insufficient because Investigator Clark testified that
appellant had care, custody, and control of the truck on May 14, 2009, yet
Investigator Clark testified that he nevertheless gave the X-Box found in the
truck’s toolbox to the passenger, Underhill, rather than appellant.  According
to Investigator Clark, Underhill said the X-Box belonged to him, and because
the officers had Underhill’s “information,” they gave the X-Box to him.  They
did not ask appellant first if the X-Box belonged to him; Investigator Clark
thought appellant may have already been taken to jail by that time. 
Nevertheless, there is evidence that the drugs in the truck belonged to
appellant; Investigator Clark testified that he had stopped appellant in the
truck before and that he had seen appellant driving the truck before, and
appellant tried to deceive the investigators by telling them he had just bought
the truck that day.  See Christensen v. State, 240 S.W.3d 25, 35 (Tex.
App.––Houston [1st Dist.] 2007, pet. ref’d) (holding that deception after an
alleged crime is one circumstance that may permit an inference of guilt when
combined with other evidence).  Moreover, both officers thought appellant was
high on methamphetamine that day, and on the recordings of the stop and
interview, appellant appears to be agitated and does not stop moving.  We must
presume that the factfinder resolved any conflicting inferences in favor of the
prosecution and defer to that resolution.  Jackson v. Virginia, 443 U.S.
307, 326, 99 S. Ct. 2781, 2793 (1979); Clayton v. State, 235 S.W.3d 772,
778 (Tex. Crim. App. 2007).  We conclude and hold that despite the minor discrepancies
in the evidence alleged by appellant, the evidence is nevertheless sufficient
to prove each of the offenses beyond a reasonable doubt.

We overrule appellant’s
second issue.

No Corroboration Required Under
Article 38.141

In his first issue, appellant
complains that the confidential informant’s “testimony” was insufficiently
corroborated.  Article 38.141(a) of the code of criminal procedure provides,

A defendant may not be convicted of an
offense under Chapter 481, Health and Safety Code, on the testimony of a person
who is not a licensed peace officer or a special investigator but who is acting
covertly on behalf of a law enforcement agency or under the color of law
enforcement unless the testimony is corroborated by other evidence tending to
connect the defendant with the offense committed.

Tex.
Code Crim. Proc. Ann. art. 38.141(a) (West 2005).  The plain language of the
statute provides that a licensed peace officer’s testimony does not need to be
corroborated.  Payan v. State, 199 S.W.3d 380, 383 (Tex. App.––Houston
[1st Dist.] 2006, pet. ref’d), cert. denied, 549 U.S. 1170 (2007).  Here,
Eubanks did not testify; only Investigators Smith and Clark testified. 
Accordingly, article 38.141 does not apply, and no additional corroboration was
required.  See id.  We overrule appellant’s first issue.  In addition,
because article 38.141 was not applicable, the trial court was not required to
give the jury an instruction regarding corroboration; we therefore overrule
appellant’s third issue as well.

Crawford
Error Not Preserved

In
his fourth issue, appellant contends that the trial court allowed evidence in
violation of Crawford; however, appellant did not object to the evidence
on Crawford or Confrontation Clause grounds.  Accordingly, we conclude
and hold that he failed to preserve error; we overrule his fourth issue.  See
Tex. R. App. P. 33.1(a)(1); Courson v. State, 160 S.W.3d 125, 129
(Tex. App.––Fort Worth 2005, no pet.).

Counsel Not Ineffective

In his fifth issue, appellant
contends that his counsel was ineffective for failing to file pretrial motions
related to the confidential informant’s involvement in the case, failing to
object to hearsay, including the “testimony” of the confidential informant, eliciting
damaging hearsay, and failing to effectively cross-examine witnesses.

Standard of Review

To establish ineffective
assistance of counsel, appellant must show by a preponderance of the evidence
that his counsel’s representation fell below the standard of prevailing
professional norms and that there is a reasonable probability that, but for
counsel’s deficiency, the result of the trial would have been different.  Strickland
v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); Salinas
v. State, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005); Mallett v. State,
65 S.W.3d 59, 62–63 (Tex. Crim. App. 2001); Thompson v. State, 9
S.W.3d 808, 812 (Tex. Crim. App. 1999).

In evaluating the
effectiveness of counsel under the first prong, we look to the totality of the
representation and the particular circumstances of each case.  Thompson,
9 S.W.3d at 813.  The issue is whether counsel’s assistance was reasonable
under all the circumstances and prevailing professional norms at the time of
the alleged error.  See Strickland, 466 U.S. at 688–89, 104 S. Ct. at
2065.  Review of counsel’s representation is highly deferential, and the
reviewing court indulges a strong presumption that counsel’s conduct fell
within a wide range of reasonable representation.  Salinas, 163 S.W.3d
at 740; Mallett, 65 S.W.3d at 63.  A reviewing court will rarely be in a
position on direct appeal to fairly evaluate the merits of an ineffective
assistance claim.  Salinas, 163 S.W.3d at 740; Thompson, 9 S.W.3d
at 813–14.  “In the majority of cases, the record on direct appeal is
undeveloped and cannot adequately reflect the motives behind trial counsel’s
actions.”  Salinas, 163 S.W.3d at 740 (quoting Mallett, 65 S.W.3d
at 63).  To overcome the presumption of reasonable professional assistance,
“any allegation of ineffectiveness must be firmly founded in the record, and
the record must affirmatively demonstrate the alleged ineffectiveness.”  Id.
(quoting Thompson, 9 S.W.3d at 813).  It is not appropriate for an
appellate court to simply infer ineffective assistance based upon unclear
portions of the record.  Mata v. State, 226 S.W.3d 425, 432 (Tex. Crim.
App. 2007).

The second prong of Strickland
requires a showing that counsel’s errors were so serious that they deprived the
defendant of a fair trial, i.e., a trial with a reliable result.  Strickland,
466 U.S. at 687, 104 S. Ct. at 2064.  In other words, appellant must show
there is a reasonable probability that, but for counsel’s unprofessional
errors, the result of the proceeding would have been different.  Id. at
694, 104 S. Ct. at 2068.  A reasonable probability is a probability sufficient
to undermine confidence in the outcome.  Id.  The ultimate focus of our
inquiry must be on the fundamental fairness of the proceeding in which the
result is being challenged.  Id. at 697, 104 S. Ct. at 2070.

Analysis

Appellant does not
specifically state which, if any, pretrial motions would have changed the
outcome of these cases.  Trial counsel’s failure to file pretrial motions
generally does not result in ineffective assistance of counsel.  Hill v.
State, 303 S.W.3d 863, 879 (Tex. App.––Fort Worth 2009, pet. ref’d).  Appellant’s
complaint is that trial counsel failed to appreciate the hearsay issue
regarding the confidential informant.  However, as we have explained, Eubanks
did not testify, and counsel may have had a reasonable strategy for not
objecting at trial to Investigator Smith’s testimony that Eubanks called him
and said appellant had re-upped, giving officers the information they wanted to
pull appellant over the second time.  Specifically, trial counsel argued in his
closing that Eubanks framed appellant.  See Lopez v. State, PD-0481-10,
2011 WL 2408942, at *3 (Tex. Crim. App. June 15, 2011) (reiterating that when
appellate court is faced with silent record regarding trial counsel’s reasons
for his or her actions or omissions at trial, court must assume “that counsel
had a strategy if any reasonably sound strategic motivation can be imagined”).

Moreover, although appellant complains
that his counsel failed to object to evidence regarding the phone call from
Tom, and additionally elicited “damaging” hearsay about what “Tom” said on the
phone,[9] counsel apparently
employed that call as part of his strategy of claiming that Eubanks framed
appellant.  In his closing, counsel suggested that Eubanks had called on
appellant’s cell phone, pretending to be Tom.  Also, in questioning
Investigator Clark about what exactly Tom had said, counsel showed that
Investigator Clark’s memory of the call was not very detailed and that no
follow-up investigation was done to determine that a man named Tom on Brierwood
was indeed the person whom Investigator Clark had talked with.  

According to appellant, his trial
counsel also did a poor job of cross-examining Todsen and asked only two
questions of Sergeant Watt.  Although trial counsel’s cross-examination of
Todsen was brief, trial counsel asked Todsen whether he had investigated if the
drugs he had weighed belonged to appellant.  Todsen said no and that he had
just tested them to see what was in them.  This cross-examination fits in with
a defense strategy of claiming the drugs did not belong to appellant and were
planted by Eubanks; the weight of the drugs or the lab’s methodology would not
be important.

Sergeant Watt’s testimony on
direct was only seven pages in the record.  He testified that he was called to
pick up appellant and transport him to the jail; he did not see any additional
drugs other than what the investigators had already found.  Sergeant Watt also
testified that appellant had asked if the truck could be released to his
brother.  Although trial counsel’s cross-examination of Sergeant Watt was
brief, it was also not inconsistent with his apparent strategy, nor was
Sergeant Watt a crucial witness for the State.

The right to effective
assistance does not guarantee errorless counsel but rather objectively
reasonable representation.  Id. at *3.  We will not second-guess trial
counsel’s apparent strategy of arguing that the evidence as admitted was
equally consistent with appellant’s being framed by Eubanks, especially with a
record that is silent on counsel’s reasons.  See id. at *3–4.  

We overrule appellant’s fifth
issue.

Conclusion

Having overruled appellant’s
five issues, we affirm the trial court’s judgments.

 

 

 

 

TERRIE LIVINGSTON
CHIEF JUSTICE

 

PANEL: 
LIVINGSTON,
C.J.; MCCOY and GABRIEL, JJ.

 

DO
NOT PUBLISH

Tex.
R. App. P. 47.2(b)

 

DELIVERED: July 21, 2011









[1]See Tex. R. App. P. 47.4.





[2]Appellant challenges both
legal and factual sufficiency.  But after appellant filed his brief, the court
of criminal appeals overruled cases that allowed a factual sufficiency review
and held that there is “no meaningful distinction between the . . .
legal-sufficiency standard and the . . . factual-sufficiency standard.”  Brooks
v. State, 323 S.W.3d 893, 902 (Tex. Crim. App. 2010).  Thus, the Jackson
standard is the “only standard that a reviewing court should apply in
determining whether the evidence is sufficient to support each element of a
criminal offense that the State is required to prove beyond a reasonable
doubt.  All other cases to the contrary . . . are overruled.”  Id. at
912.  Accordingly, we apply the Jackson standard of review to
appellant’s sufficiency issues.





[3]There is no evidence
regarding what, if anything, happened to this future delivery of
methamphetamine.





[4]According to Smith,
“re-upping” means “they gather their money from their . . . sales, and then
they go to their dealer and they buy another quantity so they can come back . .
. with their product and start selling again.”





[5]Officers attempted to
fingerprint the pipe but did not find any prints.





[6]They put the cash in an
evidence bag and turned it over to the district attorney.  The trial court
admitted the receipt from the D.A. into evidence.  Officers never found any of
the bills that the confidential informant had used to purchase drugs.





[7]Investigator Smith
explained that Eubanks was a small-time dealer who purchased his drugs from
appellant, so the sheriff’s office allowed Eubanks to work off his drug charges
by cooperating in an investigation of appellant.





[8]The exchange was as
follows:

Q  Okay.  Now, one thing - - you said
that you had stopped him before, is that right?

A  Yes, sir.  I don’t remember exactly
the date, but I had stopped - - stopped him one time before.

Q  Was he in that same vehicle when you
stopped him before?

A  Yes, sir, that’s correct.

Q  Okay.  Had you ever seen him driving
any other vehicles besides that vehicle?

A  No, sir.  Because that’s - - that
was first time I had dealt with him on the first stop.  [Emphasis
added.]





[9]Appellant also complains
that trial counsel failed to object to Investigator Smith’s “hearsay” testimony
about the weight of the drugs, but Investigator Smith testified to the results
he determined based on his own weighing of the drugs before
sending them to the DPS lab.